UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.,*<br>ROBERT HARRIS<br>4032 Tri Corner Court<br>Columbus, OH 43230 | )<br>)<br>)<br>) | |
| | )<br>) | C.A. No. 10-10068 (GAO) |
| Plaintiff-Relator, | )<br>) | |
| BRINGING THIS ACTION ON BEHALF<br>OF THE UNITED STATES OF AMERICA | )<br>)<br>) | FIRST AMENDED COMPLAINT<br>FILED UNDER SEAL<br>PURSUANT TO |
| c/o<br>UNITED STATES ATTORNEY<br>John Joseph Moakley United States<br>Federal Courthouse<br>One Courthouse Way, Suite 9200<br>Boston, MA 02210 | )<br>)<br>)<br>)<br>)<br>)<br>) | 31 U.S.C. § 3730 (b)(2)<br><br>**JURY TRIAL**<br>**DEMANDED** |
| and | )<br>) | |
| ATTORNEY GENERAL OF<br>THE UNITED STATES<br>10th and Constitution Avenue, N.W.<br>Washington, DC 20530 | )<br>)<br>)<br>) | |
| vs. | )<br>) | |
| J.P. MORGAN CHASE & CO.<br>260 Franklin Street,<br>Boston, Massachusetts 02110 | )<br>)<br>) | |
| J.P. MORGAN CHASE BANK, N.A.<br>111 Points Parkway<br>Columbus, OH 43240 | )<br>)<br>) | |
| CHASE HOME FINANCE, LLC<br>50 Milk Street<br>Boston, MA 02109 | )<br>)<br>) | |
| Defendants. | )<br>) | |

## TABLE OF CONTENTS

I.    JURISDICTION AND VENUE ........................................................................................ 1

II.   PARTIES INVOLVED................................................................................................. 2

III.  DEFENDANT RELATIONSHIPS............................................................................... 4

      A. Alter-Ego Relationships............................................................................................ 4

      B. Joint Venture Relationships..................................................................................... 4

      C. Conspiracy Relationships......................................................................................... 5

IV.   INTRODUCTION ...................................................................................................... 6

V.    BACKGROUND ON MORTGAGE SERVICING AND DEFENDANTS'
      PARTCIPATION IN GOVERNMENT PROGRAMS ..................................................... 11

      A. Mortgage Origination............................................................................................. 11

      B. Mortgage Servicing................................................................................................. 12

      C. Defendants' Home Affordable Modification Program Servicing
         Contract.................................................................................................................. 13

      D. The HAMP Contract's Binding Financial Instrument ............................................. 14

      E. The HAMP Contract's Mandatory Yearly Certification ......................................... 15

VI.   BACKGOUND  ON LOSS MITIGATION AND SUMMARY ..................................... 17

      A. Government Programs Defrauded ........................................................................... 17

      B. The Regulatory Structure For FHA-Insured Mortgages And Mortgage
         Servicers................................................................................................................. 19

      C. Scope of Fraudulent Activities................................................................................ 22

VII.  FRAUDULENT ACTIVITIES.................................................................................... 24

      A. Abuse of Trial Modification Procedure and Incentives............................................ 24

      B. Foreclosing on Mortgagors Who Agreed to Modificaiton under the
         MHA or FHA-HAMP Programs and Other Government Programs. ......................... 34

      C. Loan Modifications Agreed to and then Declined by Closing
         Department.............................................................................................................. 39

      D. Defendants Wrongfully Foreclosed On Homeowners.............................................. 43

      E. Chase Management Knew About the Clogged Servicing and
         Processing Pipeline ................................................................................................ 46

      F. Defendants Knowingly Submitted False Claims For Government
         Insurance Benefits Based On Wrongful Foreclosures ....................... .................... 49

      G. Fannie Mae and Freddie Mac ................................................................................. 66

i

|       | H. | Government Mortgage Insurers .................................................................................... | 68 |
|       | I. | Government Mortgage Insurers as Investors ................................................................ | 70 |
|       | J. | Ginnie Mae and Mortgage-Backed Security Guarantees............................................. | 70 |
|       | K. | Specific Examples of Wrongfully Foreclosed Mortgages ........................................... | 71 |
| VIII. |    | VIOLATIONS OF THE FALSE CLAIMS ACT ................................................................ | 77 |
|       |    | COUNT I ...................................................................................................................... | 77 |
|       |    | COUNT II ..................................................................................................................... | 79 |
|       |    | COUNT III.................................................................................................................... | 80 |
|       |    | COUNT IV.................................................................................................................... | 81 |
|       |    | COUNT V ..................................................................................................................... | 83 |
|       |    | COUNT VI.................................................................................................................... | 84 |
| IX.   |    | PRAYER FOR RELIEF ................................................................................................. | 85 |

This is an action filed under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, by Plaintiff-Relator Robert Harris, in the name of the United States Government and himself, to recover penalties and damages arising from the Defendants' continuing reckless, willful and knowing actions to defraud the United States Government pursuant to mortgage lending practices. In addition, this action includes a cause of action on behalf of Plaintiff-Relator seeking damages and other relief for employment retaliation by Defendants in violation of 31 U.S.C. § 3730(h).

## I.    JURISDICTION AND VENUE

1.    Plaintiff, Robert Harris, hereby alleges causes of action under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et. seq.*, arising from the Defendants' actions to defraud agencies of the United States Government, including, but not limited to, the United States Department of the Treasury, the Federal Housing Administration ("FHA"), the Department of Housing and Urban Development ("HUD"), the Department of Veterans Affairs ("Veterans Affairs"), the Farmer's Home Administration ("Farmer's Administration"), and the Department of Housing and Urban Development's Office of Public and Indian Housing ("Public and Indian Housing") (collectively, "Government Mortgage Insurers").

2.    There has been no public disclosure of the allegations contained herein.

3.    Pursuant to the requirements of the False Claims Act, 31 U.S.C. § 3729, *et. seq.*, the Plaintiff has provided the Government with confidential disclosures including exhibits prior to filing this Complaint.

4.    Plaintiff-Relator has direct and independent knowledge of all the allegations stated herein.

1

5.     Plaintiff-Relator is an original source of all the allegations contained herein as defined by the False Claims Act at 31 U.S.C. § 3730(e)(4)(B).

6.     Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. § 3732 and 28 U.S.C. § 1331 in that this action arises under the laws of the United States and jurisdiction over Count IV is also conferred by 31 U.S.C § 3730 (h).

7.     Venue is proper in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732, because the defendants have conducted, and continue to conduct business in the Commonwealth of Massachusetts, at least two of the defendants maintain offices and conduct business in Boston, Massachusetts, and the False Claims Act provides for nationwide jurisdiction of such claims under 31 U.S.C § 3732(a).

## II.     PARTIES INVOLVED

8.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

9.     Plaintiff-Relator, Robert Harris, of 4032 Tri Corner Court, Columbus, Ohio 43230 was Assistant Vice-President and Loss Mitigation Section Manager for J.P. Morgan Chase & Co. for the Chase Brand (or "Chase Prime") Bank division of the company out of the Mortgage Service office in Columbus, Ohio.  Chase Prime later became known as Chase Home Finance, LLC.  Plaintiff-Relator worked for the company for ten years and in the Loss Mitigation Department for four years.  During that period of time he met regularly with executives of all branches of J.P. Morgan Chase & Co. The company retaliated against Mr. Harris as result of his complaints about issues detailed herein.  Plaintiff-Relator went on Short Term Disability as a

2

result on September 11, 2009 and immediately upon returning to work was fired on January 11, 2010 one month before his eleven year anniversary with the company.

10.     Defendant J.P. Morgan Chase & Co. (NYSE: JPM) is a financial company incorporated under Delaware law. Chase is one of the largest banking institutions in the United States and Chase states on its website that it has assets of $2 trillion and operations in more than 60 countries. It serves customers under its J.P. Morgan, Chase, Chase Home Finance and WaMu brands. It also services mortgages from the former Bear Stearns' portfolio as that company was merged into J.P. Morgan Chase & Co. The Defendant does business throughout the United States and maintains offices throughout the United States, including offices at 260 Franklin Street, Boston, Massachusetts 02110.

11.     Defendant J.P. Morgan Chase Bank, N.A. (hereinafter, "Chase Bank") is one of J.P. Morgan Chase's main bank subsidiaries and is organized under the laws of the United States, with its principal place of business at 111 Points Parkway, Columbus, OH 43240. Chase Bank is a national banking association in the United States with locations in 23 states.

12.     Defendant Chase Home Finance, LLC is one of J.P. Morgan Chase's bank and financial subsidiaries and is organized under the laws of the United States and it is located at 50 Milk Street, Boston, MA 02109. Chase Home Finance is one of the world's largest providers of mortgages and home equity loans. Chase Home Finance is part of the JPMorgan Chase global investment and commercial bank and it is a HUD-approved lender.

13.     Defendants are collectively referred to herein as "Chase" or Defendants. At all times relevant herein, the Defendants acted in concert with each other in committing, and were aware of, the acts complained of herein, and each of the Defendants are jointly and severally

liable. Defendants also conspired with one another to knowingly commit the violations of the False Claims Act, 31 U.S.C. § 3729(a), described herein.

## III.   DEFENDANT RELATIONSHIPS

### A.   Alter-Ego Relationships

14.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

15.   Chase Home Finance, LLC and J.P. Morgan Chase Bank, N.A. are alter-egos of J.P. Morgan Chase & Co.

16.   Plaintiff-Relator alleges that J.P. Morgan Chase & Co. precluded Chase Home Finance, LLC and J.P. Morgan Chase Bank, N.A. from conducting business other than that which was directed by and in the interest of J.P. Morgan Chase & Co. This created such a unity of interest and ownership that the individuality of each entity ceased and they functioned as a single entity. J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A. and Chase Home Finance, LLC are thus jointly and severally liable in this action for each other's conduct with respect to any and all violations of the False Claims Act committed by any of these entities.

### B.   Joint Venture Relationships

17.   The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

18.   At all times relevant to the allegations herein, all of the Defendants formed separate partnerships and/or joint ventures (both formal and informal) amongst themselves, to invest in and service mortgages that are insured by the Government or backed by Government investors, and that one or more members of the Defendants' partnerships/joint ventures violated the False Claims Act in the course of doing business on behalf of the partnerships/joint ventures.

4

19.    In this way all Defendants participated in, controlled, and had an ownership interest in, and control of, various partnerships and/or joint ventures to invest in and service mortgages that are insured by the Government or backed by Government investors.    All Defendants also took profits from the proceeds that these partnerships/joint ventures generated or, alternatively, the profits were reported to shareholders under one corporate entity.    In each case, one or more of the members of each of these partnerships/joint ventures violated the False Claims Act in the course of doing business on behalf of the partnership/joint venture.

20.    Accordingly, all Defendants are jointly and severally liable in this action for any and all violations of the False Claims Act committed by each other.

C.    **Conspiracy Relationships**

21.    The allegations contained in the above paragraphs are hereby re-alleged as set forth fully above.

22.    All of the Defendants conspired with one another to defraud the Government by getting it to pay on false claims for foreclosure insurance and to obtain other Government payments related to servicing mortgages eligible for benefits through Government programs to assist homeowners.    Defendants conspired with one another to knowingly present, and/or cause to be presented, false claims to the Government related to foreclosure insurance and other payments related to servicing mortgages, and to protect the profits of all Defendants by ensuring that violations of the False Claims Act continued to occur.    Defendants agreed to conceal all information that would reveal Defendants' fraud to the Government.    Defendants also agreed to make false statements to the Government regarding the Defendants' compliance with Government regulations and laws in order for Defendants to qualify to receive payments of

5

Government foreclosure insurance and other Government payments related to servicing mortgages.

## IV.    INTRODUCTION

23.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

24.    Defendant Chase services United States mortgages insured and owned by the U.S. Government and Government sponsored entities. Chase is also an investment bank that deals in mortgage-backed securities, bonds, and other investment instruments.

25.    Plaintiff-Relator was Assistant Vice President and Loss Mitigation Section Manager for Chase for the Chase Brand Bank Division ("Chase Prime"), which later became Chase Home Finance LLC.

26.    Because Chase failed to properly execute its servicing duties to the United States, Chase knowingly violated regulations and failed to properly provide loss mitigation prior to foreclosing on thousands of homes and, as a result, Defendants submitted, or caused to be submitted, false claims to the Government for payment of foreclosure insurance, costs, fees, expenses and other funds related to these foreclosures.

27.    The central purpose of all Government agencies and programs supporting the housing industry is to increase and protect home ownership throughout the United States.

28.    The terms "wrongful foreclosure" or "wrongfully foreclose" as used herein refer to any mortgage loan that is foreclosed by Chase following or concurrent with: (1) any violation of law, rules or regulations concerning Government backed mortgages; (2) any violation of contractual terms or breach of any agreement between Chase and the Government or between Chase and the mortgagor; (3) acceptance of a loan for loss mitigation and placed in the pre-

6

modification, trial modification or permanent modification process; or (4) any failure by Chase to follow loss mitigation procedures or any failure to offer or to accept a loan modification.

29.    Defendants' actions resulted directly and indirectly in knowing violations of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*

30.    Defendants failed in their duty to properly act as a mortgage servicer beginning with the decline of the housing market and increase in default rates in or about early 2007. Defendants' mortgage servicing failures accelerated with the advent of the MHA and HAMP programs, continue to this day, and are ongoing.

31.    Defendants' inability to maintain mortgage servicing quality stems from their decision not to hire and train enough staff to handle the expected rush of defaulting mortgagors. Defendants also failed to properly manage their mortgage servicing responsibilities.

32.    Due to Defendants' fundamental position in and exposure to the mortgage and mortgage-related securities markets. Defendants knew or should have known there would be a rush of defaults.

33.    Defendants had three years to staff and train their loss mitigation department properly, and they knowingly failed to do so. Defendants still have not hired and trained sufficient staff to properly handle its mortgage servicing operations so that those operations could handle the volume of business that Defendants knew that they had.

34.    Plaintiff-Relator and others put Defendants on notice about the lack of staff, lack of proper training and failure by Defendants to properly service mortgages. Because of Defendants' knowing and conscious decision to under-staff the loss mitigation departments from 2007 to the present, Defendants could not and cannot maintain proper quality control in their mortgage servicing division.

7

35.     Among other things, Defendants lost documents, mismatched documents, and created months-long and years-long delays in its mortgage servicing duties.

36.     Defendants' inability to keep up with their loss mitigation duties led to purposeful shortcuts, including but not limited to forging documents, forging signatures, backdating documents, expanding loss recognition authority, and lack of proper document review.

37.     Defendants eventually abandoned all pretense of loss mitigation for tens of thousands of loans it considered too costly and time consuming to properly handle.

38.     The following series of events is just one illustration among many of how Defendants failed in their servicing duties:

a.  Step 1: Chase solicited or was solicited by mortgagors to apply to modify their mortgage under MHA, HAMP, FHA or other programs.

b.  Step 2: The borrower complies either by phone or via written application.

c.  Step 3: Chase either approved based on delegated authority or declined due to the borrowers' failure to comply with standard qualification to modify mortgages.

d.  Step 4: The mortgagors accepted the modification, paid and were current under the terms of the modification.

e.  Step 5: After massive delays in processing, Chase went to its mortgage investors for approval of the modification. The mortgage investors rejected the mortgage modification due to delay.

f.  Step 6: Chase's internal computer and record keeping systems did not acknowledge that any modification occurred, and immediately placed the homeowners in default for the entire period of the delay.

g.  Step 7: Chase immediately began foreclosure proceedings, with no warning to the homeowners who had been making full modification payments.

39.     These defaults and foreclosures are in violation of Chase's central duties to service mortgages and mitigate losses and in violation of federal laws and regulations concerning Government-backed mortgages through various U.S. Government mortgage insurance or

8

investment programs, and other Government programs to assist homeowners.

40.     Defendants' actions have widespread negative repercussions throughout the entire United States mortgage system and have resulted in the knowing submission by Defendants of false claims to the Government.    Defendants' knowing and deliberate actions destroyed mortgage value, created false defaults and eventually led to wrongful foreclosures, resulting in numerous false claims being presented to the United States.

41.     The MHA and HAMP programs were designed to help families in economic distress.  Chase knowingly and wrongfully foreclosed on and then sold the homes of these families, and in many of these cases Defendants collected funds from Government programs as a direct result of Defendants' knowing and wrongful actions.

42.     Defendants have knowingly and wrongfully devalued the Federal National Mortgage Association's ("Fannie Mae") and the Federal Home Loan Mortgage Corporation's ("Freddie Mac") investments in U.S. mortgages. Defendants' actions led directly to losses for Fannie Mae and Freddie Mac on their mortgage-backed securities and have resulted in Defendants knowingly causing false claims being presented to the United States.

43.     Defendants' actions have resulted in and continue to result in false claims being submitted and/or losses to all Government insurers of mortgages and mortgage-backed securities, including but not limited to, the Federal Housing Authority ("FHA"), the Department of Veterans Affairs ("Veterans Affairs"), the Farmer's Home Administration ("Farmer's Administration"), and the Department of Housing and Urban Development's Office of Public and Indian Housing ("Public and Indian Housing") (collectively, "Government Mortgage Insurers"), and Fannie Mae and Freddie Mac.

44.     Government National Mortgage Association ("Ginnie Mae") guarantees the

9

timely payment of interest and principal on mortgage-backed securities. Defendants' actions also resulted in millions of dollars of claims and unnecessary losses to Ginnie Mae and have resulted in Defendants knowingly causing false claims being presented to the United States.

45.    Each of the Government Mortgage Insurers runs one or more mortgage insurance programs.   Defendants' actions resulted in false claims, false records, and losses being submitted, or caused to be submitted, to virtually all U.S. Government mortgage insurance programs.

46.    In requesting and receiving millions of dollars annually, Defendants have engaged in a protracted course and pattern of fraudulent conduct to submit, or cause to be submitted, false claims for payment to or approval by the United States, by, *inter alia,* falsely representing every year that they are in compliance with federal laws and regulations requiring that Defendants comply with Government insured mortgage programs and other Government programs designed to assist homeowners. Defendants had, and continue to have, actual knowledge that they are not complying with their obligations, that their representations of compliance, and creating false records, were and are knowingly false when made, and that Defendants therefore were and are knowingly submitting false or fraudulent representations of compliance in order to obtain Government funds. Alternatively, Defendants act and have acted with deliberate indifference and/or reckless disregard as to the truth or falsity of the claims and to knowingly conceal their misconduct.

47.    Plaintiff-Relator asserts causes of action under the False Claims Act for submission of knowingly false or fraudulent claims for payment or approval, and knowingly false records or statements to get a false or fraudulent claim paid or approved, in violation of 31 U.S.C. § 3729(a)(1)(A) and (B); for conspiracy to commit such violations, in violation of 31

U.S.C. § 3729(a)(1)(C); for violations of 31 U.S.C. § 3729(a)(1)(D), for failing to return money or property belonging to the United States; for violations of 31 U.S.C. § 3729(a)(1)(A), (B) and (G), for "reverse" false claims and knowingly making, using or causing to be made or used, a false record or statement that is material to an obligation, whether fixed or not, to pay or transmit money or property to the Government, and/or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation, whether fixed or not, to transmit money or property to the Government resulting from an express or implied grantor-grantee or contractual relationship, from statute or regulation, or from the retention of any overpayment.

48.     Plaintiff-Relator allege that the violations of 31 U.S.C. § 3729, *et seq.*, by Defendants, as set forth herein, are continuing and ongoing.

## V.     BACKGROUND ON MORTGAGE SERVICING AND DEFENDANTS' PARTCIPATION IN GOVERNMENT PROGRAMS

### A.     Mortgage Origination

49.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

50.     A mortgage begins with a mortgage originator.  The mortgage originator finds a potential mortgagor, checks the ability of the mortgagor to repay the loan, and supplies the initial loan to the borrower.  The mortgagor secures the loan with a lien on the house.

51.     Usually, the mortgage originator will then sell the mortgage and its cash flow to a Government or private investor.

52.     Government sponsored enterprises buying mortgages include, but are not limited to, Fannie Mae and Freddie Mac.

53.     Fannie Mae and Freddie Mac are both currently in conservatorship under the Federal Housing Finance Agency, with the support and backing of the U.S. Treasury.  Money

11

from the United States is and has been used to purchase mortgages through Fannie Mae and Freddie Mac. Thus, Defendants' knowing submission of false claims to Fannie Mae and Freddie Mac result in causing false claims to be submitted to the United States.

54. Once a Government entity owns the mortgage, the Government entity contracts with a mortgage servicer to service the loan.

55. Often, mortgage originators will have investors, servicers, and insurers lined up and ready to go prior to the closing of the loan.

56. For example, for loans originated by Chase, the servicing agreement would already be worked out at the time of closing. For prime loans, Chase itself would be the servicer. For subprime loans, Chase would contract with a third-party servicer.

**B.    Mortgage Servicing**

57. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

58. Generally speaking, the servicer's duty is to handle the day-to-day maintenance of the loan, including but not limited to billing, loss mitigation, and eventually foreclosure if necessary.

59. Each servicing contract is unique to an investor or a pool of mortgages, and payment and scheduling details differ from contract to contract. Servicing contracts for Government investors all include and fall under their relevant laws, rules and regulations.

60. Servicers take money from the mortgagor, and pass the paid principal or interest (depending on the servicing contract) to the investor.

61. If the servicer only passes through interest payments to the investor, the remaining payment from the mortgagor goes to pay off the principal. This principal is marked

12

off the mortgage, but is not necessarily sent to the investor.

62.     Investors pay a monthly or a yearly billing fee, separate from the stream of money from the mortgagor.  The servicer receives a servicing fee for the execution of its duties.  A typical fee paid to Chase from the Government is $24.95 per loan per month.

63.     Without default, the servicer is eventually obligated to the investor for the full value of the original closing note of the mortgage, including principal and interest.

64.     In cases of default and foreclosure, the servicer is obligated to pay the investor for the value of the property as sold in foreclosure, up to the amount of remaining principal.

65.     If the property sells for more than its original principal amount, the servicer keeps the excess value as "reimbursement for operational losses."

66.     Any reimbursement for operational losses directly profits the servicer.  Chase's operational losses include anything it costs the company to run.  Defendants created false records, submitted false claims, or cause false claims to be submitted, for the Government to pay for such costs and fees, which directly boosts Chase's profit margins.

67.     Chase services mortgages for Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Authority, the Department of Veterans Affairs, other Government Mortgage Insurers, and private investors.

C.      **Defendants' Home Affordable Modification Program Servicing Contract**

68.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

69.     On July 31, 2009, Chase Bank Senior Vice President Michael R. Zarro, Jr., signed on behalf of Defendants a contract with Freddie Mac, which was designated by the U.S. Treasury Department as a financial agent of the United States regarding the Home Affordable

13

Modification Program ("HAMP"), in which Chase agreed to provide services in the HAMP program, including but not limited to providing trial and permanent loan modifications to mortgagors who qualified for the program. In exchange for providing these services the Government agreed to pay Chase incentive payments.

70.     In § 1(A) of the contract, Defendants agreed that it:

> Shall perform the loan modification and other foreclosure prevention services . . . described in (i) the Financial Instrument attached hereto as Exhibit A . . . ; (ii) the Program guidelines and procedures issued by the Treasury . . . ; and (iii) any supplemental documentation, instructions, bulletins, letters, directives, or other communications . . . .

71.     The contract includes a clause that Defendants will provide an annual certification "as to its continuing compliance with, and the truth and accuracy of, the representations and warranties set forth in the Financial Instrument." § 1(B).

72.     In § 4(E), Defendants agreed to maintain complete and accurate records regarding its modifications:

> Servicer shall maintain complete and accurate records of, and supporting documentation for, the borrower payment, including, but not limited to, PITIA (principal, interest, taxes, insurance . . . ), and delinquency information and data provided to Fannie Mae regarding each agreement relating to a trial modification period and each loan modification agreement executed under the Program . . . .

## D.     The HAMP Contract's Binding Financial Instrument

73.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

74.     The HAMP agreement with Defendants incorporates a Financial Instrument, attached as Exhibit A to the contract.

14

75.     The terms of the Financial Instrument entered into by Chase include the following:

   a.  In §3(b), an agreement to "collect, retain and provide to Treasury, Fannie Mae and Freddie Mac all data, information and documentation relating to the Program and borrowers, loans and loan modifications implemented, or potentially eligible for modification ... and any trials conducted in connection with the Program..."

   b.  In §4(a), an agreement to develop and implement an internal control program, to be enforced and reviewed on a quarterly basis, designed to, among other things, "ensure effective delivery of Services in connection with the Program..."

   c.  In § 5(b), a representation as to "accuracy" that the "Servicer is in compliance with," among other things, "all applicable Federal laws, regulations, regulatory guidance, and statutes..."

   d.  In § 5(d), a "covenant" that the Servicer will "perform the Services required . . . in accordance with the practices, high professional standards of care, and degree of attention used in a well-managed operation . . . ."

   e.  In § 5(f), the Servicer acknowledges that "the provision of false or misleading information to Fannie Mae or Freddie Mac in connection with the Program or pursuant to the Agreement may constitute a violation of . . . the civil False Claims Act . . . ."

76.     Defendants have willfully failed to comply with the terms of the Financial Instrument and HAMP contract, they have failed to ensure effective delivery of services, failed to accurately state that Defendants are in compliance with all federal laws, regulations, regulatory guidance and statutes, they have failed to provide services "with the practices, high professional standards of care, and degree of attention used in a well-managed operation," and they have knowingly provided false or misleading information to Fannie Mae and Freddie Mac in connection with the program.

**E.      The HAMP Contract's Mandatory Yearly Certification**

77.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

78.    In addition to the requirements in the Financial Instrument, the HAMP agreement

incorporates a yearly certification, attached as Exhibit B to the contract.

79.    Every year, Chase, as a servicer, certified, among other things, that:

   a.   Servicer is in compliance with, among other things, all applicable Federal laws,
        regulations, regulatory guidance, and statutes.

   b.   Servicer has performed its obligations in accordance with its obligations with the
        Agreement ...

   c.   Servicer will "perform the Services required . . . in accordance with the practices,
        high professional standards of care, and degree of attention used in a well-
        managed operation . . . ."

   d.   Servicer acknowledges that "the provision of false or misleading information to
        Fannie Mae or Freddie Mac in connection with the Program or pursuant to the
        Agreement may constitute a violation of . . . the civil False Claims Act . . . ."

80.    At the time Chase Bank Senior Vice President Michael Zarro, Jr., signed the

contract to participate in HAMP, Defendants knew, or reasonably should have known, that the

certifications of compliance set forth in Exhibit B to the contract were false.

81.    Each time Defendants made an annual certification that they had complied and

will comply with "all applicable Federal laws, regulations, and regulatory guidance, and

statutes," Defendants knew, or reasonably should have known, that the certifications were false.

82.    Each time Defendants made their annual certifications that they provided and will

provide the services requested "in accordance with the practices, high professional standards of

care, and degree of attention used in a well-managed operation," Defendants knew, or reasonably

should have known, that the certifications were false.

16

## VI.   BACKGOUND  ON LOSS MITIGATION AND SUMMARY

A.   **Government Programs Defrauded**

83.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

84.   Defendants have engaged in and continue to engage in fraudulent practices including, but not limited to, double-billing the federal Government for incentives to provide loan modifications through the Making Homes Affordable Refinance program ("MHA") and the related program the Federal Housing Administration Home Affordable Modification Plan ("FHA-HAMP").

85.   In addition, after the mortgagor had provided all the required documents and the loan was put in trial modification status pursuant to those programs, Defendants still wrongfully foreclosed on loans and knowingly obtained additional federal Government money as a result.

86.   The MHA and FHA-HAMP programs were created to encourage refinancing and modifying of loans to prevent foreclosure as part of the federal Government's Financial Stability Plan and they were designed to "...help up to 7 to 9 million Americans reduce their monthly mortgage payments to more affordable levels." See About Making Home Affordable on Making Home Affordable.gov website.

87.   The MHA and the FHA-HAMP programs both provide incentive payments to banks to encourage them to modify mortgages.

88.   Government incentives for loans to be put in trial modification status were contingent on halting foreclosures.

89.   The FHA-HAMP guidelines, for example, state "Any foreclosure action will be temporarily suspended during the trial period, or while borrowers are considered for alternative

17

foreclosure prevention options." See, Home Affordable Modification Program Guidelines of March 4, 2009.

90.      Defendants also wrongfully foreclosed on Government sponsored and Government insured loans, it had agreed to modify prior to enactment of the MHA or FHA-HAMP programs.

91.      These earlier loans were foreclosed upon after months of payments at a new level were made by the borrower on loans insured by the FHA or invested or guaranteed by other Government entities liable for expenses and fees in foreclosure proceedings.

92.      These foreclosures include loans guaranteed by agencies of the United States as well as loans in which the United States provided funds as an investor.

93.      Government funds are at risk in loans serviced by Chase through several agencies including, but not limited to, the Federal Housing Administration ("FHA"), and Housing and Urban Development ("HUD"), which sponsors mortgages as investors.

94.      In addition, after restructuring investments using Troubled Asset Relief Program ("TARP") funds, the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"), funds also involve investments by the United States. The Government National Mortgage Association ("Ginne Mae") invests in loans issued by the FHA, the Department of Veterans Affairs, the Rural Housing Service and the Office of Public and Indian Housing also issue mortgages.

95.      The FHA also insures loans including loans involving investments of private funds.

96.      When FHA insured loans are defaulted or foreclosed the Agency must pay expenses and fees based on the claims made by the servicer or by Chase.

18

**B.      The Regulatory Structure For FHA-Insured Mortgages And Mortgage Servicers**

97.      The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

98.      Defendants are a bank, mortgagee and mortgage servicer under the Code of Federal Regulations ("CFR"), 24 C.F.R. §§ 202 and 203. To receive and keep Federal Housing Administration ("FHA") insurance benefits, Defendants must comply with the regulations in 24 C.F.R. § 203. These regulations mandate that Defendants engage in a process called loss mitigation before foreclosing on any mortgagor.   24 C.F.R. §§ 203.501, 203.502.   Loss mitigation, in turn, is triggered by a homeowner defaulting on a mortgage. FHA regulations of mortgage servicers also delineate the system through which Defendants make claims to the Government for insurance benefits. *See, e.g.*, 24 C.F.R. § 203.

99.      To service FHA-insured mortgages, Defendants must first register for FHA approval as a mortgagee and servicer.   24 C.F.R. §§ 203.1 to 203.7.   Requirements for registration include renewing approval each year, and meeting all general requirements for participation.      *See* Mortgagee Approval Handbook (4060.1), §§ 2-1, 4-1, *available at* http://www.hud.gov/offices/ adm/hudclips/ handbooks/hsgh/4060.1/40601c2HSGH.pdf.

100.      Accordingly, "All mortgagees must follow all applicable statutes, regulations and HUD written instructions, including program handbooks and mortgagee letters on loan originations." *Id.* at § 2-18.   Mortgagees must also follow all requirements of HUD's "Administration of Insured Home Mortgages" Handbook.   *Id.* at § 2-20; *see also* "Administration of Insured Home Mortgages, HUD Handbook 4330.1, *available at* http://www.hud.gov/offices/adm/hudclips/ handbooks/hsgh/4330.1/.

19

101.    In the course of servicing mortgages, if a mortgagor defaults, Defendants must engage in loss mitigation techniques to minimize the costs to the FHA.  24 C.F.R. § 203.501. Defendants' investor agreements with Fannie Mae and Freddie Mac have similar requirements. If the loss mitigation techniques do not work, and the homeowner remains in default for more than three full payments, Defendants may then foreclose.

102.    When Defendants make a claim, or cause a claim to be submitted, to FHA for insurance benefits, they must submit a claim to HUD.  Per the HUD Handbook:

> Automated Processing.  Form HUD-27011, Parts A and B, are processed by computer at HUD Headquarters. If the information provided on the form passes all system edits and control checks, the system will compute and generate payment to the mortgagee. The system edits are designed to permit prompt payment of most claims by accepting costs encountered in routine claims.

"FHA Single Family Insurance Claims," HUD Handbook 4330.4 REV-1, *available at* http://nhl.gov/offices/adm/hudclips/handbooks/hsgh/4330.4/index.cfm (describing the process of making a claim for insurance benefits to FHA).

103.    Loss mitigation is a mandatory requirement for Defendants to participate in the FHA mortgage insurance program.  Beginning with the rules governing the FHA insurance program, the statute mandates that mortgagees engage in loss mitigation, as follows:

> Upon default of any mortgage insured under this subchapter, mortgagees *shall* engage in loss mitigation actions for the purpose of providing an alternative to foreclosure (including but not limited to actions such as special forbearance, loss modification, and deeds in lieu of foreclosure, but not including assignment of mortgages to the Secretary under section 1710(a)(1)(A) of this title) as provided in regulations by the Secretary.

12 U.S.C. § 1715u (emphasis added).

104.    Based on the statutory requirement, the regulations of FHA insured mortgages clearly establish the requirement to loss mitigate.  They state, for example, that "It is the intent of

20

the Department that no mortgagee shall commence foreclosure or acquire title to a property until the requirements of this subpart have been followed." 24 C.F.R. § 203.500. "Mortgagees . . . *must take* those appropriate actions, which can reasonably be expected to generate the smallest financial loss to the Department." 24 C.F.R. § 203.501 (emphasis added). "*Documentation must be maintained* for the initial and all subsequent [loss mitigation] evaluations and resulting loss mitigation actions." 24 C.F.R. § 203.605 (emphasis added); *see also* 24 C.F.R. § 203.365 (requiring claim files be kept for three years after submission for benefits).

105.    The handbook for administration of insured home mortgages states that a central servicing objective is "protecting HUD's interest in the insured mortgage (i.e., minimizing the probability of an insured mortgage terminating in default and foreclosure, and by minimizing HUD's loss where claims cannot be avoided)." Administration of Insured Home Mortgages (4330.1), § 1-3(B), HUD directive number 4330.1, *available at* http://www.hud.gov/offices/adm/ hudclips/handbooks/hsgh/4330.1/.

106.    HUD also makes clear that foreclosure should be considered a last resort through its letters and FAQs. *See, e.g.,* "FHA NSC Loan Servicing and Loss Mitigation FAQ," *available at* http://www.hud.gov/offices/hsg/sfh/nsc/faqnsctc.cfm ("Foreclosure should only be considered as a last resort and should not be initiated until all relief options have been exhausted."). HUD took pains to not be subtle about this requirement, stating, "**PARTICIPATION IN THE LOSS MITIGATION PROGRAM IS NOT OPTIONAL.**" "Loss Mitigation Program – Comprehensive Clarification of Policy and Notice of Procedural Changes," HUD Letter 00-05, *available at* http://www.hud.gov/offices/hsg/sfh/nsc/lmmltrs.cfm (click on link next to document "00-05") (bold and capitalization in original).

107.    Defendants must engage in loss mitigation to keep the federally backed insurance

21

benefits. The relevant regulations state:

> Mortgagees *must reimburse* the Secretary for any claim and interest overpaid because of *incorrect, unsupported, or inappropriate information provided by the mortgagee, or because of failure to provide correct information.*

24 C.F.R. § 203.365. (emphasis added). This obligation to reimburse the Government for overpayments is created at the time of overpayment. *Id.*

108.    Failure to engage in loss mitigation will result in the "imposition of a civil money penalty, including a penalty under §30.35(c)(2), or withdrawal of HUD's approval of a mortgagee." 24 C.F.R. § 203.500 (introducing the subpart describing servicing and loss mitigation requirements); *see also* 24 C.F.R. § 203.605(c) ("A mortgagee that is found to have failed to engage in loss mitigation . . . shall be liable for a civil money penalty as provided in §30.35(c) of this title.").

## C.    Scope of Fraudulent Activities

109.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

110.    Detailed below is the pattern of behavior by Defendants to defraud Government programs, including abuse of Government incentives as well as knowingly presenting false and improper charges for loans foreclosed which should not have been.

111.    Each of these transactions creates damages to the United States and the Defendants acted knowingly to create such damages.

112.    The scope of the fraud is massive and ongoing. At least 700 people work in the Plaintiff-Relator's division of Chase namely the Loss Mitigation Department for the Chase Brand.

22

113.    There are two offices for this Loss Mitigation Department, one in Milwaukee, Wisconsin and the other in Columbus, Ohio with a call center in Arizona as well.

114.    Chase as a whole employs approximately 2,000 people to handle loss mitigation issues on loans serviced by all its companies.

115.    The Plaintiff-Relator worked in the Chase Prime (later Chase Home Finance, LLC) Loss Mitigation Department and through that department became aware that all the branches of Chase were involved in the fraudulent activities detailed below.

116.    For example, in April and May of 2009 a new group was established by Chase to handle what the bank referred to as "imminent default" loans.

117.    Chase defined imminent default loans as those loans which were still current, but for which the mortgagor had contacted the bank and attempted to modify the loan and possibly qualify for MHA or FHA-HAMP support.

118.    This group handled loans for all branches of Chase, including but not limited to, WaMu (Washington Mutual), Bear Stearns, and Chase.

119.    David Staggert a vice president working out of the Chase offices in Rochester, New York headed the imminent default group.

120.    Columbus staff including the Plaintiff-Relator flew to Rochester on or about the end of April or beginning of May 2009 to train the Rochester, New York Staff on Loss Mitigation functions.

121.    During the Months of June and July 2009, the Plaintiff-Relator was also asked by his supervisor Bill Becker to sit in on his weekly conference calls with Joyce Thachik and Brad Kallner who were Vice Presidents of WaMu's Loss Mitigation stationed in Jacksonville, Florida and Richard Wade the Vice President for Bear Sterns out of Lewisville, Texas.

23

122.     During these conference calls the above individuals indicated they were following Chase Prime's lead by resetting trial modifications until the systems could be adapted to complete the final modifications.

123.     It is clear from the Plaintiff-Relator's direct observations that all branches and divisions of Chase that were involved in the mortgage business were following and using the same flawed procedures that he observed in the Loss Mitigation Department of Chase Prime (later Chase Home Finance, LLC).

124.     Defendants' fraudulent scheme is nation-wide in scope and it is continuing and ongoing.

125.     The allegations detailed below involve tens if not hundreds of thousands of mortgages serviced by or involving the Defendants.

## VII.   FRAUDULENT ACTIVITIES

### A.   Abuse of Trial Modification Procedure and Incentives

126.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

127.     Plaintiff-Relator has examined spreadsheet documents showing lists of loans processed by Defendants under the Making Homes Affordable Refinance program ("MHA") and the Federal Housing Administration Home Affordable Modification Plan ("FHA-HAMP").

128.     One such spreadsheet shows more than 62,000 loans handled by the Chase Prime offices for Chase in active trial modification as of August 10, 2009 and a spreadsheet from the same time period showing another 8,000 loans in the FHA-HAMP program serviced by Chase.

24

129.    Prior to implementation of the MHA program in April of 2009 the Loss Mitigation Department in which the Plaintiff-Relator worked processed approximately 5,000 loans per month.

130.    When the Government began paying for incentives to modify loans in April of 2009, the Loss Mitigation Department proved incapable of keeping up with the demand.

131.    Indeed the Plaintiff-Relator complained as soon as he heard about these programs that staffing levels would not be able to keep up with the demand any new programs would create.

132.    Defendants' way of handling the additional loans generated by the programs was to stop placing loans in permanent modification altogether and instead reset the trial modification period for mortgages.

133.    Resetting loans meant that Defendants could bill the incentive for placing a loan in trial modification status again, as opposed to extending the trial modification status, which would not generate an additional payment.

134.    Defendants' executives and senior management were aware that resetting loans created additional revenue and had an incentive to do so.

135.    Chase Senior Executives of Loss Mitigation, including Bill Becker, Judy Lockhart, David Little, and John Berens directed officials including the Plaintiff-Relator to reset loans starting in June of 2009.

136.    Mr. David Conley, Vice-President Chase Prime Collections Department, had the job of running both the inbound and out bound collection call centers dealing with loan modification customers. Ms. Bobby Reinking ran the Loss Mitigation call center in Arizona.

137.    Mr. Becker directed both Conley and Reinking on or about June of 2009 to have any mortgagor calling in receive a reset loan.

138.    As a result thereafter, it was standard practice to respond to calls from mortgages by resetting the loan.

139.    The practice is ongoing.

140.    Many of these executives, including Mr. Becker, have bonus plans based on revenue.

141.    While the Relator's own bonus plan included payments of approximately $8,500 per quarter and $26,000 at the end of the year, the executives he reported to receive larger bonuses. Generally, those bonuses are based on income.

142.    During the down turn in the banking industry over the past year, thousands of extra incentive payments made by the MHA and FHA-HAMP programs provided an additional income stream to the Loss Mitigation Department.

143.    Since the beginning of the MHA program in April of 2009, Defendants did create trial modifications for Government invested or insured loans, but stopped all efforts to modify loans with funds provided from its own investments.

144.    Therefore, after April of 2009, the vast majority of the tens of thousands of which were serviced by Defendants in Loss Mitigation were financed by or insured by some Government entity.

145.    Defendants can make claims to the Government for incentive payments to modify mortgages in the MHA or FHA-HAMP programs.

26

146.    Under MHA or FHA-HAMP the Defendants can make a claim to the Government for payment of $1,000 for any loan they serviced and put into a trial modification status and $1,000 upon making that modification permanent.

147.    If the Defendants permanently modified the loan they would also be entitled to $1,000 per year for three years on success of the loan.

148.    Incentive payments are made to the bank from the Troubled Asset Relief Program ("TARP") funds.

149.    The MHA program and the related FHA-HAMP program, provide for a modification period of three months prior to making the loan modification permanent.

150.    Chase started its participation in MHA program in March of 2009.

151.    Therefore, by June 1, 2009 any of the first set of loans placed in trial modification status would be due for a permanent modification or rejection for lack of documentation or payments.

152.    Instead, the majority of the 70,000 eligible loans listed in the two spreadsheets referred to above and reviewed by the Plaintiff were reset, rather than put into permanent modification status.

153.    Those spreadsheets represent only the loans in loss mitigation for the Chase Prime Division of the bank on August 10, 2009.  The number of loans serviced by Chase as a whole affected by this practice is much greater.

154.    Chase did not inform the Government that a loan was in its second trial modification. It used standard processes to notify the Government that a loan was being placed in trial modification status.

27

155.   Defendants were able to obtain at least two incentive payments per loan for resetting a loan in trial modification status.

156.   Plaintiff conducted a spot survey and provides 50 representative loans, which he specifically confirmed were reset with loans from the MHA and FHA-HAMP programs.

157.   Loss Mitigation Department officials as discussed below, made it an imperative that loans in what its officials referred to as its processing "pipeline" for 90 days in trial modification be reset.

158.   Some loans were also foreclosed.

159.   The list below, which redacts the loan numbers assigned by Chase, includes a representative sample of reset loans as follows:

| Loan Nbr | Principal | Prop Type | System | Pre Qual | Trial Mod. Pay. | Guardian Sent Dt. |
|----------|-----------|-----------|--------|----------|-----------------|-------------------|
| Loan #1 | $81,001.00 | 1 | RE | YES | $801.74 | 6/11/09 |
| Loan #2 | $309,055.79 | 1 | RE | YES | $1,209.00 | 5/22/09 |
| Loan #3 | $269,712.56 | 1 | RE | YES | $1,217.48 | 6/1/09 |
| Loan #4 | $239,908.56 | 11 | RE | YES | $1,279.95 | 6/15/09 |
| Loan #5 | $51,562.84 | 1 | RE | YES | $587.84 | 5/29/09 |
| Loan #6 | $227,712.49 | 11 | RE | YES | $1,630.56 | 5/28/09 |
| Loan #7 | $409,553.89 | 1 | RE | YES | $1,063.61 | 5/6/09 |
| Loan #8 | $204,383.64 | 1 | RE | YES | $1,326.80 | 6/2/09 |
| Loan #9 | $155,059.68 | 1 | RE | YES | $885.36 | 5/11/09 |
| Loan #10 | $176,047.59 | 1 | RE | YES | $945.50 | 5/18/09 |
| Loan #11 | $269,553.89 | 1 | RE | YES | $1,465.46 | 5/18/09 |
| Loan #12 | $243,198.18 | 1 | RE | YES | $720.28 | |
| Loan #13 | $123,038.22 | 1 | RE | YES | $2,386.61 | 6/12/09 |
| Loan #14 | $154,788.96 | 1 | RE | YES | $884.21 | 6/3/09 |
| Loan #15 | $98,573.69 | 10 | RE | YES | $736.25 | 5/18/09 |
| Loan #16 | $270,000.00 | 1 | RE | YES | $1,588.75 | 6/2/09 |
| Loan #17 | $399,664.86 | 11 | RE | YES | $1,798.00 | 5/18/09 |
| Loan #18 | $145,200.73 | 11 | RE | YES | $965.93 | 5/27/09 |
| Loan #19 | $279,330.38 | 1 | RE | YES | $2,128.54 | |
| Loan #20 | $355,604.34 | 1 | RE | YES | $1,162.50 | 6/2/09 |

| Loan #21 | $229,358.70 | 1  | RE | YES | $930.00    | 5/13/09 |
| Loan #22 | $198,887.81 | 1  | RE | YES | $849.54    | 5/11/09 |
| Loan #23 | $334,270.29 | 1  | RE | YES | $1,054.00  |         |
| Loan #24 | $435,294.14 | 1  | RE | YES | $1,550.00  | 5/29/09 |
| Loan #25 | $238,167.59 | 10 | RE | YES | $1,422.25  | 5/12/09 |
| Loan #26 | $318,603.88 | 1  | RE | YES | $1,913.36  | 5/18/09 |
| Loan #27 | $299,200.00 | 11 | RE | YES | $1,470.18  | 6/3/09  |
| Loan #28 | $92,110.10  | 1  | RE | YES | $514.91    | 6/8/09  |
| Loan #29 | $97,888.88  | 1  | RE | YES | $740.00    | 5/18/09 |
| Loan #30 | $302,000.07 | 1  | RE | YES | $2,247.50  | 5/27/09 |
| Loan #31 | $260,326.67 | 1  | RE | YES | $992.00    | 5/18/09 |
| Loan #32 | $181,095.84 | 1  | RE | YES | $961.00    | 5/18/09 |
| Loan #33 | $270,347.92 | 1  | RE | YES | $893.98    |         |
| Loan #34 | $365,148.65 | 1  | RE | YES | $1,702.52  | 5/19/09 |
| Loan #35 | $375,666.58 | 10 | RE | YES | $1,736.00  | 5/26/09 |
| Loan #36 | $257,467.12 | 11 | RE | YES | $1,240.00  | 5/18/09 |
| Loan #37 | $186,418.98 | 1  | RE | YES | $832.86    |         |
| Loan #38 | $360,000.00 | 1  | RE | YES | $2,207.61  | 5/18/09 |
| Loan #39 | $522,071.71 | 2  | RE | YES | $2,524.21  | 6/2/09  |
| Loan #40 | $192,960.23 | 11 | RE | YES | $1,128.40  | 6/2/09  |
| Loan #41 | $289,788.99 | 1  | RE | YES | $1,210.16  | 6/1/09  |
| Loan #42 | $415,048.21 | 1  | RE | YES | $3,069.02  |         |
| Loan #43 | $249,718.99 | 1  | RE | YES | $1,438.27  | 5/28/09 |
| Loan #44 | $56,041.18  | 1  | RE | YES | $465.00    |         |
| Loan #45 | $98,539.60  | 1  | RE | YES | $879.87    |         |
| Loan #46 | $207,184.64 | 1  | RE | YES | $1,550.00  |         |
| Loan #47 | $321,667.09 | 1  | RE | YES | $930.00    | 6/12/09 |
| Loan #48 | $154,225.83 | 1  | RE | YES | $633.50    | 6/12/09 |
| Loan #49 | $405,360.35 | 1  | RE | YES | $1,418.25  | 6/12/09 |
| Loan #50 | $409,553.61 | 1  | RE | YES | $2,194.80  | 6/11/09 |

160. These loans were reset back into trial modification status and the bank obtained additional incentive payments as a result.

161. Chase officials made conscious decisions to reset loans in trial modification status and generate new incentive payments rather than extend the status of the trial modification or put the loan in permanent status or simply not bill the United States again.

29

162. By June of 2009, Bill Becker, Vice President Chase Prime Loss Mitigation, who was the Plaintiff-Relator's immediate supervisor, determined that loans should be reset instead of extended in trial modification.

163. Mr. Becker decided Chase should just reset the trial modification in order to "buy" another 90 days to process loans, specifically so the investors, including federal Government entities such as Fannie Mae and Freddie Mac, would not know J.P. Morgan Chase was extending the trial modification period past 120 days.

164. Mr. Becker directed personnel, including the Plaintiff-Relator, to reset loans on or about June 1, 2009, when the first set of trial modifications were due to become permanent under the MHA Program.

165. His directive affected the entire portfolio of loans in the Chase Loss Mitigation Department.

166. The immediate effect of resetting the loan was to deceive investors including, but not limited to, Fannie Mae and Freddie Mac regarding the length of time a loan was actually in trial modification status.

167. Prior to July 1, 2009, Crissy Shirkey would run computer macro programs to reset trial modification loans.

168. Indeed, David Conley confirmed this practice in an email on June 17, 2009 to Bill Becker in which he wrote:

> Bill, can you let your staff know that Crissy is resetting the MHA plans on KOI5 due to them getting ready to break. We are having her reenter the amounts and dates 30 days from the conversation date and then entering the next two promises on the 1st of the month. If this is not done, the MHA plan will show broken on the system; therefore in the dialer campaigns.
>
> Can you please reiterate to your staff so that Crissy can stop receiving emails/Sametimes. Thanks.

169. The point of the email was to have loan officers stop contacting Ms. Shirkey about individual loans as she was already resetting loans on a macro basis.

170. After July 1, 2009, Chase switched to a new computer system and macro programs were not available to reset loans into trial modification status.

171. Instead, the Loss Mitigation Department would hand out lists of loans to be reset to staff including approximately 300 people in Milwaukee and 400 in Columbus to enter reset trial loans individually into the new computer system.

172. Resetting loans, as opposed to permanently modifying loans, required additional actions by Defendants to conceal their practices.

173. Computer problems did exacerbate the difficulties Defendants had modifying loans they serviced.

174. For example, the company had improper management controls in place on its "Early Resolution" computer program.

175. The program, purchased by Chase from Freddie Mac, is used to calculate appropriate modifications of the loan payment schedules. It is widely known that the program did not correctly calculate the type of modification or the amount of payments for a modified loan.

176. Nonetheless, Chase continued to rely on it and reset loans to get more time to deal with the individual loans.

177. In the process, Chase knowingly obtained additional incentive payments from TARP and or other Government funds and failed to fix this computer program after Chase became aware of the problems. Indeed, this computer program continues to cause problems for the company and Chase has not replaced it.

31

178.    Billing the United States for incentive payments under the FHA-HAMP or the MHA program, and the submission of claims to Government agencies resulting from foreclosures, is an automated process.

179.    Chase acts as the servicer of these loans.

180.    As part of its duties Chase will take a spreadsheet of modified loans from Loss Mitigation Department and send those to the Investor Relations Department electronically.

181.    Investor Relations is responsible to enter updated information for any loan onto the investor's computer system and enter any modifications or payments onto that investor's system.

182.    Then Investor Relations sends the information via spreadsheet electronically to the Claims Department.

183.    The Claims Department issues an invoice to the investor for Chase's fee to service the loan and issues invoices to the Government for MHA or FHA-HAMP incentives.

184.    The Government receives information only that the loan has been placed in trial modification status and would have to compare earlier loan data with new loan data to know that a loan has been reset, rather than freshly put into trial modification status.

185.    This practice of resetting in Trial Modification status went beyond the Chase Prime division and involved the entire Chase operations.

186.    In or about the end of April or beginning of May 2009 the Plainitff was part of a group of Loss Mitigation officials sent from Columbus, Ohio to train staff in Rochester, New York.

187.    It was immediately apparent to the Plaintiff during these meetings that the Rochester staff was inadequate to handle the amount of business involved.

32

188.    After the implementation of a new computer system in July of 2009 much of the work to modify or service loans from Rochester was re-routed back to Columbus, Ohio.

189.    Indeed, the Rochester, New York group was never able to handle the volume of the full amount imminent default loans it was created to service.

190.    The Plaintiff-Relator observed that beginning in June and July of 2009 Mr. Staggert's group was sending lists of loans to Bill Becker of the Loss Mitigation Department in Columbus, Ohio so Mr. Becker could direct these loans to be reset, because of the inability to process trial modifications into permanent modifications.

191.    In addition, during the months of June and July, 2009, the Plaintiff-Relator was asked by Bill Becker to sit in on weekly conference calls with Joyce Thachik and Brad Kallner who were Vice President WaMu's Loss Mitigation Department stationed in Jacksonville, FL and Richard Wade Vice President for Bear Sterns out of Lewisville, TX.

192.    During these meetings the above individuals indicated they were following Chase Prime's lead by resetting trial modifications until the systems could be adapted to complete the final Modifications.

193.    The Plaintiff-Relator therefore had direct contact with officials of all J.P. Morgan Chase branches who were acting in a similar manner towards loan modifications as his own Loss Mitigation Department.

194.    When a homeowner agrees to modify a loan, that loan is supposed to be in trial status for three monthly payments and then converted to permanent status.

195.    Chase's actions deliberately undermined the goal of the Government's loan incentive programs, which is to help home owners avoid foreclosure by providing Government funded incentives to modify loans.

33

196.    Chase reset the trial modification of loans and deliberately increased the Government incentive payments it obtained for each reset loan.

197.    Each time it reset a trial modification of a loan Chase automatically presented a claim to the United States for an additional loan modification incentive payment.

198.    By resetting the trial modification of loans multiple times, Chase knowingly increased the total amount of claims presented to the United States for such incentive payments.

199.    The United States did, in fact, make incentive payments to Chase as a result of the multiple claims for payments presented as a result of these multiple resetting of loans.

200.    Each such multiple claim knowingly presented by Chase was a false claim because Chase was not entitled to receive such multiple incentive payments for placing a loan in trial modification status more than once.

201.    In addition, Chase knowingly failed to take loans from trial modification status into permanent modification status as contemplated by the MHA and FHA-HAMP programs, thereby adding to the falsity of its claims for incentives payments by placing loans in trial modification status multiple times.

**B.    Foreclosing on Mortgagors Who Agreed to Modificaiton under the MHA or FHA-HAMP Programs and Other Government Programs.**

202.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

203.    Poor implementation of trial modifications also led to the very tragedy the entire MHA and FHA-HAMP programs and other Government mortgage insurance programs were designed to prevent, namely foreclosed loans.

204.    It also led to false claims and costs for the United States Government.

34

205.    Even though a borrower made payments in the trial modification period for the loan and provided all the required documents, the Defendants still knowingly and wrongfully foreclosed on loans.

206.    Below is a list of a few examples of such foreclosed loans:

| LOAN # | INVESTOR | SALE DATE | STATE | KEY DOCS IN LL | NO KEY DOCS | DUP |
|--------|----------|-----------|-------|----------------|-------------|-----|
| Loan A | FNMA | 10/19/09 | CA | X | | X |
| Loan B | FNMA | 10/20/09 | CA | X | | |
| Loan C | FNMA | 22-Oct | MI | X | | X |
| Loan D | FHLMC | 21-Oct | AL | X | | X |
| Loan E | FNMA | 22-Oct | ID | X | | X |
| Loan F | PVT | 21-Oct | VA | X | | X |
| Loan G | FHLMC | 20-Oct | CA | | X | X |
| Loan H | FHA | 19-Oct | IL | X | | X |
| Loan I | FHA | 20-Oct | FL | | X | |
| Loan J | FHLMC | 21-Oct | CA | X | | X |
| Loan K | PVT | 21-Oct | CA | X | | |

207.    The above list, which redacts the loan numbers assigned by Chase, includes nine loans for which Chase received all the documents required for a permanent modification in the MHA program.

208.    This list was generated by the Plaintiff-Relator from a default management reporting list and his own spot investigation.

209.    The "Sale Date" indicates not only that the loan was foreclosed, but also that the title was sold at foreclosure auction meaning the mortgagor was forced out of the property.

210.    The borrowers listed in this chart did everything they were required to do under the Government program, including making payments at the new rate, only to lose their property as a result of Defendants' fraudulent and wrongful conduct.

35

211.   When "FHA" is noted as the investor in this chart it means the loan was actually generated by HUD.  FHA acts as HUD's investor when HUD is the loan source.

212.   FHA, VA and other Government Mortgage Insurers also insure loans for other investors.

213.   FHA, VA and other Government Mortgage Insurers' insured loans were also wrongfully foreclosed by Defendants.

214.   The Government Mortgage Insurers' participation ensured that the Government would bear the expense of foreclosed loans and the nine loans listed above would have been foreclosed after they had been placed in trial modification status with the mortgagor paying according to the modified terms.

215.   Chase also received incentive payments on the loans in trial modification status.

216.   Of the nine loans listed above which were foreclosed, six had also been reset by Chase further complicating the situation.

217.   Chase therefore received two trial modification incentive payments for these loans and still foreclosed on them.

218.   On or about the middle of July 2009, Mr. Harris first learned of these kinds of loans being placed in foreclosure, when he received calls from irate borrowers whose homes were being auctioned.

219.   He tracked the problem and noted that despite the fact that the department he worked in was receiving at least 20 such inquiries a day of foreclosed loans, no steps were taken to prevent these foreclosures.

220.   Mr. Harris personally observed foreclosures on loans despite the borrower taking all steps required to modify the loan including making payments under trial modifications.

36

221.    Loans in trial modification status, under which the borrower is making required payments cannot be foreclosed legally, but Defendants still did it.

222.    This process undermined the entire purpose of the MHA and FHA-HAMP programs and other Government mortgage insurance programs.

223.    Defendants' decision to bill the U.S. Government for expenses related to such foreclosures was done with reckless disregard and willfulness as the Defendants were aware they had a problem foreclosing incorrectly on loans since before implementation of MHA and FHA HAMP programs.

224.    Chase management was well aware of the problems of improperly foreclosed loans and did little if anything to fix the problem and nothing to prevent expenses accruing to the United States as a result of wrongful foreclosures.

225.    Improper foreclosures occurred in part because of problems with several of Defendants' computer programs and computer systems.

226.    Prior to July of 2009, Chase relied on a Foretracs computer system which processed loans but which failed to notify the Foreclosure Department in a timely manner.

227.    After the July 1, 2009 implementation of MSP the new computer system also lacked the reporting systems for Defendants to track foreclosure holds properly.

228.    After Plaintiff brought these problems to the attention of Chase management, the company still callously disregarded these problems and the Defendants foreclosed on loans improperly at all times relevant to the FHA-HAMP and MHA programs as well as other Government backed loan programs.

229.   In his Becker Hot Topics PowerPoint presentation of September 11, 2009 the Senior Manager refers to the problem as delicately as possible. Under the title "Issues/Concerns/Opportunities" he writes:

Foreclosure Holds. This continues to be a major focus. We have completed review of loans that have gone to sale to determine which one need to have the sale rolled back. Panama is still updating ER and we are still waiting on programming fixis for DRI. The process is still manual but is effective.

The same PowerPoint notes:

Action Plans A(as Applicable)

Foreclosure holds. This plan will be added to cover the project and associated risk with gap in automation of foreclosure holds.

230.   However, after September 11, 2009, such foreclosures did not stop.

231.   Such foreclosures should not have occurred on a loan participating in the MHA or FHA-HAMP program, or other Government backed loan mortgage programs, when such loans were in trial modification status.

232.   Indeed, Chase received incentive payments from the Government not to foreclose on such loans.

233.   Management was aware of the problem, and either unable or unwilling to stop the flow of incorrectly foreclosed loans.

234.   The Government not only was wrongfully charged trial modification incentives, but the United States also paid expenses of foreclosure in FHA or other Government insured loans or in Government invested loans knowingly and wrongfully foreclosed by Defendants.

235.   The Plaintiff-Relator obtained email correspondence dated September 1, 2009, in which Chase officials knowingly act to charge the Government for such failure and wrongful foreclosures.

38

236.    The emails detail a loan foreclosed upon which was made pursuant to the FHA–HAMP program in which the borrower had done what should be done to modify the loan.

237.    Nonetheless, Chase not only foreclosed on the loan, but was sure to "do nothing to invalidate the guarantee" so that the loan would be transferred back to HUD after the foreclosure action and the U.S. Government would pay.

238.    Defendants' knowing and willful misconduct, knowing violation of regulations and wrongful foreclosures were not isolated or a singular instance, and constituted a pattern of wrongful conduct, and it is continuing and ongoing.

## C.    Loan Modifications Agreed to and then Declined by Closing Department

239.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

240.    Chase's inability to handle trial modifications and Defendants failure to properly engage in loss mitigation also cost the Government when the Bank improperly attempted to clean the so-called "pipeline" of loans.

241.    The company had approximately 10,000 loans in closing status with Loss Mitigation in the Plaintiff-Relator's department and another approximately 16,000 out for negotiation as of December 2008.

242.    Such loans would be processed all the way through the Chase system as being modified for several months and still get foreclosed.

243.    The loans could be modified, for example, after a mortgagor was five months delinquent on the initial loan.

244.    Chase would agree to a modification and the mortgagor would complete all the documents and paperwork.

39

245.   In addition, the mortgagor would make payments for as long as nine months thereafter at the modified loan rate only to be foreclosed upon at the end of the process simply because Chase failed to process properly the loan internally.

246.   Defendants made errors when negotiating a loan, lost signed documents from the borrower, and delays in entry into investor programs. Investor programs include the WP2 and HSSN computer systems for example used by Fannie Mae and the Freddie Mac.

247.   Those investors use these systems to track the deals for payments.

248.   As the servicer, Chase was supposed to update the investors' computer systems with the new information of the modified loans.

249.   Defendants' administrative failures in dealing with these systems delayed final processing of these loans.

250.   Defendants were aware of the backlog of un-processed loans and their failure to meet their obligations under federal mortgage loan programs, but they still proceeded with wrongful foreclosures and knowingly and willfully created false records and submitted, or caused to be submitted false claims for payment to the Government under each of the federally insured or Government invested mortgage programs.

251.   Chase's lack of staff to handle the volume of loans meant its internal final steps in servicing the loans, the very work Chase was paid to do, was not completed timely.

252.   The problem of loans simply sitting in what the company called its "pipeline" meant that by the time Chase identified a problem with a modified loan it was almost impossible to fix.

253.   Loan rates would change and re-approvals from investors would have to be obtained.

40

254.    Loans that had been approved and had been agreed to by all parties were instead foreclosed.

255.    The delay resulted because of an increase in volume in loans that needed to be modified and Chase's reluctance to hire enough staff to handle the business.

256.    As a result, simple processing of loans, which should have occurred, created problems even for loans, which had been approved by investors.

257.    Beginning on March 27, 2009 Mr. Harris was provided a daily list of loans from the Default Reporting Group headed by Chris Stump.

258.    These loans had been dealt with respect to both the borrower and all appropriate approvals from Chase and the investor.

259.    The only issue pending was changing the loan's status in production main frame known as the "RE" a standard computer system used by Chase at the time to manage the loan's status.

260.    Mr. Becker directed Mr. Harris to get the system change completed or decline the loan.

261.    The goal was to have no loans in this status by the July 1, 2009 date of a conversion to a new computer system.

262.    The reason for declining these loans was a delay in processing.

263.    Nonetheless, Chase declined on approximately 10% of the pending loans or some 2,500 loans as a result of their inability to handle the processes properly by July 1, 2009.

264.    Defendants then submitted or caused to be submitted false claims to the United States regarding these foreclosures and/or passed the expenses of such foreclosed loans on to the Government in the case of Government invested or sponsored loans by Government Mortgage

41

Insurers, including but not limited to, FHA, HUD, VA, Fannie Mae, Freddie Mac and other Government agencies.

265. In 2009, Plaintiff-Relator conducted a spot check of a list of 26,000 loans in modification status for the purpose of finding specific examples as evidence for this complaint. Not surprisingly, he quickly found six representative loans, which should not have been foreclosed.

266. These loans are merely representative and a full investigation of the list of 26,000 will reveal many more.

267. A further investigation of loans in modification status throughout Chase will reveal even more such wrongfully foreclosed loans and resulting false claims by Defendants because the Defendants' willful and wrongful practices have been ongoing and are continuing.

268. Any foreclosure of a duly modified loan, which the mortgagor had made payments pursuant to the new terms of that loan, would undermine the entire purpose of the MHA and FHA-HAMP programs, and other Government backed and Government invested mortgage programs, even if the specific loan were not modified pursuant to Government incentives.

269. Moreover any loan insured by FHA or the VA, or other Government agencies, or provided by a Government entity investor such as Fannie Mae or Freddie Mac, would also force the U.S. Government to pay costs of mortgages that should have not been placed in foreclosure (and related foreclosure fees) as a result of Defendants' knowing and wrongful actions.

270. The six representative loans above all involve Government investments through the FHA, Freddie Mac or Fannie Mae and the expenses of foreclosure would be borne by those entities.

42

271.    The backlog of Defendants' own loans which it could not process timely contributed to the company's inability to handle the loans it attempted to put into loss mitigation in federally insured Government programs and the MHA and FHA-HAMP programs.

**D.    Defendants Wrongfully Foreclosed On Homeowners**

272.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

273.    Beginning in 2007, large numbers of homeowners went into default. In 2008 and continuing into the present day, Defendants began wrongfully foreclosing on thousands of people. Despite having experience with large volumes of defaulting mortgages from dealing with the Hurricane Katrina crisis, and despite early indications of increased default rates, Defendants failed to dedicate the money, personnel, and resources necessary to properly service its mortgages.

274.    Wrongful foreclosures began with the offer of a mortgage modification agreement to a mortgagor in default. Defendants offered, and mortgagors signed, loan modification agreements that would lower their monthly payments. The modification plans also reset the foreclosure clock for mortgagors in default, giving mortgagors a new three-installment grace period to be in default before any foreclosure may be initiated. If all went well, Defendants and the mortgage investor were supposed to accept the lower modified payments as full payments based on the new modification plan.

275.    Defendants knew they did not have the capacity to process the defaulting loans and made errors when negotiating with the mortgagor, Defendants lost signed documents from the borrower, and had extreme delays—often lasting months—entering information into the systems of their investors, including Freddie Mac, Fannie Mae. Defendants' delays in processing

43

were so long that the investors would reject the modifications, given that deadlines were not met and even interest rates would have changed by the time Defendants tried to confirm its modifications with investors who had previously agreed to them.

276.   If a mortgage modification is rejected, the normal course of action is that Chase, as the mortgage servicer, records the temporary modification, credits the homeowner with full payments, and returns the mortgage to the original mortgage agreement. Instead, Defendants' internal computer systems acted as if the mortgage modification *never happened*. Defendants would retroactively count a homeowner's full payment under the modified terms as a *default* payment under the original mortgage, which required higher monthly payments. To compound the problem, Defendants' delays were often more than five months long, and in such cases homeowners made full modified payments, but were counted as being in default for five months or more by the time Defendants wrongfully rejected the homeowner's mortgage modification.

277.   When Defendants rejected a mortgage modification, its internal systems indicated that a homeowner was more than three payments into default. Defendants then *immediately* began foreclosure proceedings, with no warning to the homeowner outside of a foreclosure notice. This even happened to people who were making *full payments* under the modification agreement.

278.   This means Defendants foreclosed on homeowners who *were not even in default*. Under no circumstances should such a loan have been foreclosed, but Defendants foreclosed on thousands of loans in this manner.

279.   There were variations on this type of wrongful foreclosure. Sometimes, the homeowners made full payments under their mortgage modification. Other times, homeowners only made partial payments or perhaps no payments at all, yet Defendants foreclosed within a

44

homeowner's three payment grace period before foreclosure. Other homeowners were already in a mortgage modification, were granted a new mortgage modification, and then were wrongfully foreclosed. Some homeowners received multiple mortgage modifications, all at the same time, with multiple modifications active, and yet Defendants still foreclosed on them.

280. A mortgagor may make partial payments under a trial modification or modification plan that add up to multiple full payments. This is supposed to extend the mortgator's default period for as many months as there are full payments (for example, two half payments should be considered a single full payment, and extend the default date by a month). Defendants commenced foreclosure on mortgators who were within the extended payment period.

281. In all these cases, Defendants did not properly execute their responsibilities for loss mitigation. Therefore, when Defendants foreclosed on thousands of mortgagors they did so wrongfully. In many cases, Defendants did not just fail to engage in loss mitigation, Defendants actively rejected loss mitigation efforts by foreclosing on loans they had already agreed to modify. The most egregious examples were when Defendants foreclosed on homeowners who were not in default.

282. Regardless of whether Defendants asked for MHA incentives in resetting any individual loan from trial to permanent modification, Defendants did, in fact, reset many loans under the MHA and FHA HAMP programs. Such reset loans should have provided more time to the mortgagor to correct any default prior to a foreclosure action. Like the other loans in Defendants' broken processing system, Defendants wrongfully foreclosed on these mortgages as well. The Plaintiff-Relator was aware of many example loans where Defendants received all documents required for a permanent modification under these programs, where the borrowers

45

were making modified payments on time, and yet Defendants still foreclosed many of these mortgages.

283.    Plaintiff-Relator is aware that Defendants foreclosed on thousands of loans where Defendants knowingly violated regulations and/or failed to properly provide loss mitigation prior to commencing and obtaining foreclosures, and as a result of these actions Defendants created false records and knowingly submitted or caused to be submitted thousands of false claims to the Government.

**E.    Chase Management Knew About the Clogged Servicing and Processing Pipeline**

284.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

285.    Defendants' mortgage servicing problems were well-known in the upper echelons of Defendants' management. Plaintiff-Relator personally raised the problems of insufficient personnel and computer systems with his superiors. In fact, the problems were so well known that by March 27, 2009, Plaintiff-Relator was provided a *daily* list of thousands of loans stuck in Defendants' processing pipeline. These lists included loans Defendants had agreed with the mortgagor to modify, but could not because of its inadequate personnel and internal systems. This was especially distressing to Mr. Harris, as he was one of the officials who signed loan modification documents sent out to the mortgagor on behalf of Chase.

286.    Mr. Harris, as an Assistant Vice President, had authority to sign loan modification offers to mortgagors on behalf Chase. When those mortgagors were wrongfully foreclosed, he felt a strong sense of personal responsibility.

287.    Instead of addressing the backlog responsibly by increasing processing capacity and accepting the financial losses stemming from its own efficiency problems, Defendants'

46

management chose to ramrod the stuck mortgages out the door.

288.    The actions of Mr. William Becker, Vice President of Loss Mitigation and Plaintiff-Relator's supervisor, were particularly harmful. Mr. Becker directed Plaintiff-Relator to modify the backlog of mortgages, and if that could not be done immediately, to summarily decline the modifications. The result, as Mr. Becker knew, would be to wrongfully decline loans Defendants had already agreed with the mortgagor to modify. When Mr. Harris raised questions in 2009 about Chase taking action would lead to wrongful foreclosures, Mr. Becker's response included a threat to terminate Mr. Harris' employment.

289.    During most of 2009, Chase worked with Pegasystems, Inc., of Cambridge, MA, to develop a new computer system to improve processing of loans for the entire corporation. Plaintiff-Relator attended software development meetings from June 22-24 of 2009 in Texas on behalf of Mr. Becker. Plaintiff-Relator, although an Assistant Vice President of Chase, was a relatively lower ranking executive at these meetings, which included attendance by executives from throughout Chase, including all of the Defendants.

290.    Plaintiff-Relator maintains that the fraud he encountered at Chase was practiced throughout Chase as a whole, involving each of the Defendants. Chase Prime (or Chase Home Finance, LLC) was the division others looked to for guidance. The meetings with Pegasystems, and the broad spectrum of executives attending from throughout Chase, including from each of the Defendants, confirmed that Chase's practices implicated the entire corporation and other Chase subsidiaries involved in the mortgage loan business.

291.    Plaintiff-Relator personally observed Defendants' executives at these meetings complain—before, during, and after the meetings—of a myriad of processing problems. These included, but were not limited to, the increased volume of loan modification requests and the

47

lack of adequate response by Defendants. In their complaints, the Defendants' executives demonstrated awareness that these processing delays would result in wrongful foreclosures. Software development engineers took detailed notes of Chase's troubles during the meetings in order to craft a solution.

292.    The Pegasystems effort was eventually cancelled because of cost concerns and the expectation that Chase's new Real Estate ("RE") system would solve the problem. Plaintiff-Relator knew that Mr. Becker opposed implementation of Pegasystems' software. Not having been implemented, it is unknown whether the Pegasystems solution would have solved the internal processing problems at Chase. The RE system did not solve Chase's problems. Rather than finding a solution, Defendants' processing failures continued through the MHA and FHA-HAMP programs, and continue to this day.

293.    The Plaintiff-Relator advised his supervisors that Loss Mitigation simply did not have enough personnel to handle the backlog of mortgages in its own pipeline.

294.    He repeated these points upon being advised of the pending implementation of the MHA and FHA-HAMP programs and he noted that the lack of personnel would contribute to the Defendants inability to handle loans properly with the obvious result of loans being foreclosed that should not be.

295.    The backlog of loans and the lack of personnel also contributed to Defendants' desire to reset rather than provide loss mitigation as required or permanently modify the loans in the MHA and FHA-HAMP programs, and other Government programs, as discussed above.

296.    Mr. Harris' complaints to Mr. Becker and other superiors did not have the effect of the bank either hiring appropriate personnel or stopping foreclosures or stopping the practices of charging the Government for Defendants' own failures in servicing loans.

48

297.    Instead, Mr. Harris was ultimately fired from his position in retaliation for reporting Defendants' fraud to management.

**F.    Defendants Knowingly Submitted False Claims For Government Insurance Benefits Based On Wrongful Foreclosures**

298.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

299.    To deal with these problems, Defendants had several options at its disposal. At one extreme, Defendants could have simply stopped foreclosure processing to avoid any wrongful foreclosures. Alternatively, Defendants could have initiated a system to double-check its foreclosure process, so that no insurance claims would be presented to the Government for payments related to wrongful foreclosures. For actual wrongful foreclosures, Defendants' only responsible path of action was to make the mortgagor whole, and take the losses stemming from its own failures. Defendants also could have refrained from making claims for Government insurance or reimbursed the Government for payments to Defendants stemming from wrongful foreclosures.

300.    Defendants did not take any such responsible path. Knowing it had wrongfully foreclosed on homeowners, Defendants made insurance claims to the FHA and the VA and other Government Mortgage Insurers for insurance benefits as well as related fees to get the federal Government to pay for Defendants' knowing and willful mistakes and failures in loss mitigation and wrongful foreclosures. The now ex-homeowners, already in financial distress, were left to bear the cost of suing Defendants individually. No claims for payment of Government insurance benefits and fees should have been made by Defendants because these were wrongful foreclosures. All such claims by Defendants contained false information.

301.    Defendants' false claims for Government insurance benefits and fees easily

49

measure in the hundreds of millions of dollars. This value stems from the sheer number of mortgages Chase services, Defendants' purposeful decision to forego quality controls in clearing tens of thousands of defaulted mortgages from its books, the fact that the vast majority of Defendants' mortgage loans are FHA insured (or insured by some other Government agency), and the fact that Defendants only makes claims for FHA benefits when it loses money.

302.    Plaintiff-Relator was aware that the average cost of a foreclosure to Defendants was estimated by Chase to be approximately $30,000 per foreclosure in 2008, including losses from the value of the home and foreclosure processing costs. The processing costs include filing the foreclosure in court, title searches, and attorneys' fees. *See* 24 C.F.R. § 203.257. Because of the size and breadth of Chase's portfolio, since 2008, average losses from home foreclosure sales have more than doubled and the actual amount of false claims submitted to the Government for foreclosure insurance claims and related payments is much higher.

303.    In the thousands of cases where Defendants did not engage in loss mitigation *at all*, Defendants' obligation to reimburse the Government includes *each and every claim paid* by the FHA, or other Government agency, to Defendants for *any* foreclosure conducted without proper loss mitigation. For example, Chase gave Plaintiff-Relator a list of 26,000 mortgages that it wanted processed without any effort at loss mitigation. For every mortgage on that list, Defendants have failed to live up to its duty to engage in loss mitigation. This means that every foreclosure from that list would result in a false claim to the FHA for mortgage insurance benefits, even if the foreclosure can be otherwise justified.

304.    Beyond FHA insurance liability in Chase's prime mortgage servicing division, Defendants are liable through Government entities that own the mortgages Chase was supposed to service. These entities include, but are not limited to, Freddie Mac, Fannie Mae, Ginnie Mae,

and the Veterans Administration. These federally backed entities act as investors in the Chase's portfolio, and any losses stemming from fraudulent foreclosures resulted in false claims to the Government. These losses account for several hundreds of millions of dollars in fraudulent transactions where Chase is the beneficiary.

305. As large as these numbers are, they are small compared to the size of Defendants' operations, which is counted in the billions of dollars. According to Chase's own press releases, its First Quarter 2010 earnings—that is, three months of earnings—net $3.3 billion, out of $28.2 billion in revenues. *See* Press Release, "JPMorgan Chase Reports First-Quarter 2010 Net Income of $3.3 Billion, or $0.74 per Share, on Revenue of $28.2 Billion" (April 14, 2010).[1] Chase also notes that it has kept "$2.3 billion in . . . litigation reserves, including those for mortgage-related matters." *Id.* This implies that Defendants' executives knew that their mortgage business is troubled; expected to litigate their way out of much of it.

306. The same press release states that Defendants approved 185,000 permanent mortgage modifications from 2009 through the first quarter of 2010. *Id.* This is a large number of approvals, except when compared to the 750,000 modification Defendants offered in the same time period. *Id* This leaves 565,000 modification offers that had not received permanent status by the end of March of 2010.

307. When Defendants were making billions of dollars in profits, they refused to expand their operations to compensate for their inability to process mortgages and properly provide loss mitigation that is required.

308. Defendants have knowingly violated 31 U.S.C. §§ 3729(a)(1)(A), (B), (D) and

---

[1] Chase has reported Second Quarter 2010 earnings as a net $4.8 billion out of $25.6 billion in revenue and Chase reported Third Quarter 2010 earnings as a net $4.4 billion out of $24.3 billion in revenue.

51

(G), and are liable for treble damages, plus interest, and civil fines related Defendants' involvement in false claims submitted for FHA and other Government backed mortgage insurance.

309.    The FHA requires that Chase submit information on its mortgages and loss mitigation techniques when making claims for FHA insurance benefits.   The FHA requires mortgagees and servicers to use form HUD-27011 to make a claim for FHA insurance benefits:

> The vehicle utilized for payment of insurance proceeds from HUD
> to a Mortgagee is the Insurance Benefit Claim form HUD-27011.
> This form is utilized for all submissions of claims for Conveyance
> of Property and Loss Mitigation Option incentives.

*See* "FHA NSC Loan Servicing and Loss Mitigation Frequently Asked Questions," *available at*

http://www.hud.gov/offices/hsg/sfh/nsc/faqnsctc.cfm; "Single-Family Application for Insurance

Benefits," form HUD-27011 (07/2009), *available at* http://www.hud.gov/offices/adm/hudclips/

forms/hud2.cfm; "FHA Single Family Insurance Claims", HUD Handbook 4330.4 REV-1, § 1-1,

*available at* http://nhl.gov/offices/adm/hudclips/handbooks/hsgh/4330.4/index.cfm.

310.    The form contains information Chase must fill out to receive insurance benefits.

In particular, the following boxes are noteworthy.

- Box 1 asks for "Claim Type."  In this field, the form lists several options. Among the options are three boxes labeled "31-Spec. Forb." and "32-Modification."   If Chase is making a claim for a mortgage in a special forbearance or a modification, it must mark those boxes.

- Box 4 asks for a code as to why the borrower defaulted.  Default reasons include lost income, medical problems, and other types of inability to pay.

- Box 7 asks for the "Due date of first payment to principal and interest."  The box is separated into two compartments, one for the first due date of the original mortgage, and another for the first due date of any modified mortgage.

- Box 8 asks for the "Due date last complete installment paid."  The last complete

installment is calculated according to 24 C.F.R. § 203.556(b).[2]

- Box 11 asks for the "Date foreclosure proceedings" instituted. This date must be three full installments after the last complete installment paid (Box 8) because the mortgagor must be at least three full payments in default before foreclosure proceedings may be instituted. 24 C.F.R. § 203.606 ("The mortgagee may not commence foreclosure for a monetary default unless at least three full monthly installments due under the mortgage are unpaid after application of any partial payments that may have been accepted but not yet applied to the mortgage account.").

- Box 15 asks for the "Mortgage amount," for both the original and modified mortgage.

- Box 17 asks for the "Unpaid loan balance as of date in Box 8" (Box 8 requests the due date of the last complete installment).

- Box 19 asks for the "Expiration date of extension to foreclose / assign."

*See* "Single-Family Application for Insurance Benefits," form HUD-27011, *available at*

http://www.hud.gov/offices/adm/hudclips/forms/hud2.cfm; *see also* "FHA Single Family

Insurance Claims", HUD Handbook 4330.4 REV-1, § 1-1, *available at* http://nhl.gov/offices/

adm/hudclips/handbooks/hsgh/4330.4/index.cfm (explaining the application for insurance

benefits).

311.    Each time Chase submitted or caused to be submitted claims for insurance

benefits on wrongfully foreclosed loans, some of these boxes on the forms that were submitted to

---

[2]    The calculation is described in the regulations:

> Except as provided in this section, the mortgagee shall accept any partial payment and either apply it to the mortgagor's account or identify it with the mortgagor's account and hold it in a trust account pending disposition. When partial payments held for disposition aggregate a full monthly installment they shall be applied to the mortgagor's account, thus advancing the date of the oldest unpaid installment but not the date on which the account first became delinquent.

24 C.F.R. § 203.556(b).

the Government contained false statements.

312. Based on the Relator Harris' knowledge of how Chase processed foreclosures, Chase submitted false statements when it submitted form HUD-27011 to claim FHA insurance benefits. These statements are incorrectly described services, which constitute false claims and false records under the False Claims Act.

313. In Box 1, the "Claim Type" information is false under many situations. One example is when a mortgagor is in a first-time mortgage modification which Chase foreclosed. *See* "Single-Family Application for Insurance Benefits," form HUD-27011, *available at* http://www.hud.gov/offices/adm/hudclips/forms/hud2.cfm. In such a case, Chase would not check off the Special Forbearance or Modification boxes in their claim form. As far as Chase's computer system is concerned, the first-time modification does not exist, and no prior modification would exist. This would constitute a false statement by omission. By omitting the check box, Chase is indicating that the mortgagor is still under the original mortgage and did not undergo any modification or attempt to modify their loan with the bank. Such a circumstance is a direct misrepresentation of what the Mortgagor had agreed or attempted to do.

314. By filling out Box 4, Chase has stated (a) the reason for default and (b) the existence of a default. One or both could be false statements because mortgagors may enter multiple modification agreements, depending on their situation. If a more recent default is not registered in Chase's systems, then Chase will indicate a default under the prior modification. Worse, full payments under the new (unrecognized) modification means *there was no default*. Nonetheless, Chase still indicated in Box 4 that the mortgagor was in default.

315. Chase's statement in Box 4 is false when Chase wrongfully foreclosed on a mortgagor who was in an earlier modification for medical reasons and then received a more

54

recent modification for a lost job. Chase's computer systems would not register the most recent modification for a lost job, and the stated reason for default would be the medical problem. In such a case, the reason for default is false, though the default does exist. Alternatively, if the mortgagor was making full payments under the most recent modification, both the reason for default and the existence of default are false.

316.    There are cases when Chase may have truthfully answered Box 4, though. For example, when a homeowner lost her job, and that was the reason for defaulting on the original mortgage. Subsequently, after a modification, the homeowner may again be in default because of her lost job, but Chase foreclosed too early on the homeowner. In such a case, Chase's Box 4 would be true because (a) the default actually exists, and (b) the reason for default is accurate.

317.    In Box 7, the start date for the modified mortgage will be false as long as it was based on a wrongful rejection of a mortgage modification.

318.    The information in Box 8, indicating the last complete installment paid by the mortgagor, will be false. A proper claim for FHA insurance benefits requires that the mortgagor miss three full installments. When Chase wrongfully foreclosed on homeowners not in default under mortgage modification plans, or homeowners who were making partial payments, or homeowners who were not yet three months into default, this date cannot be correct.

319.    Box 11, covering the date foreclosure proceedings began, is likely true. However, this will provide evidence the foreclosure began too soon. A mortgagee cannot begin foreclosure proceedings until a homeowner misses three full payments. Comparing the date in Box 11 (beginning of foreclosure proceedings) to when a foreclosure should actually begin, will demonstrate that Chase foreclosed prematurely on many homeowners.

320.    Box 15, covering the mortgage amount, may or may not be false. It would

55

depend on whether the mortgage modification that Chase wrongfully rejected modified the mortgage amount. If the mortgage amount was modified, then Box 15 will contain false information because the modification never made it into Chase's systems. If the mortgage amount stayed the same, but interest and number of payments changed, then Box 15 may contain true information. When this information is false Chase would be asking for insurance benefits to cover a false amount of the loan.

321. The information in Box 17, which asks for the unpaid loan balance as of the last complete installment payment, may be false. Much like in Box 15, which should reflect the mortgage amount, the falsity of Box 17 will depend on whether the rejected mortgage modification changed the loan amount.

322. It is almost impossible to enter into a loan modification, which in some way does not change the loan amount. Therefore the information in both box 15 and box 17 will be false in most if not all cases.

323. Box 19, which holds the "expiration date of extension to foreclose," is false in most cases. Mortgagors less than three payments in default under a mortgage modification plan should not receive foreclosure extensions or foreclosure expiration dates.

324. Defendants knowingly made and used false records based on actual knowledge of, deliberate ignorance of, or reckless disregard for the truth, and submitted or caused to be submitted false claims to the Government in violation of 31 U.S.C. § 3729(a)(1)(A) and (B).

325. The evidence of Defendants' knowledge of falsity includes, but is not limited to, Chase's internal documents, documents in the possession of wrongfully foreclosed mortgagors, Chase's software development efforts, and other evidence, including Plaintiff-Relator's knowledge that he was told by Chase to decline mortgages that Chase had already agreed to

56

modify.

326.    Without making the false statements, and concealing the falsity of these records from the Government, Chase would not have received, and would not have been able to keep, its FHA insurance benefits. FHA processes applications by computer at HUD headquarters. The computers will calculate and generate payment to mortgagees after conducting system edits and control checks. "FHA Single Family Insurance Claims," HUD Handbook 4330.4, § 1-3(B), *available at* http://nhl.gov/ offices/adm/hudclips/handbooks/hsgh/4330.4/index.cfm.        By supplying the false information, described above, Chase managed to bypass HUD's automated system checks. For example, if Chase had filled out a claim form and indicated that a home *wasn't* in default, the automated system would decline the claim.

327.    Chase knowingly supplied false fiscal data to obtain the FHA calculated insurance benefits. A claim for insurance benefits requires "Fiscal data pertaining to the mortgage transaction," and "Any additional information or data that the Secretary may require." 24 C.F.R. § 203.365(a) (Subpart B). The data supplied by Chase when applying for insurance benefits on form HUD-27011 fits into the categories of fiscal data and "additional information" required by the Secretary of HUD. The data is used to calculate the FHA insurance premiums. By supplying false fiscal data, Chase manipulated and fraudulently increased the calculation of FHA insurance premiums, premiums which would not and should not have been paid if the true fiscal data had been supplied. Furthermore, even if Chase received Government money, it should not have been allowed to keep them if it had supplied truthful and accurate information.

328.    Chase's incorrect fiscal data allowed it to keep money that it was required to reimburse the Government. Mortgagees must "reimburse the Secretary for any claim and interest overpaid because of incorrect, unsupported, or inappropriate information provided by the

57

mortgagee, or because of failure to provide correct information." 24 C.F.R. § 203.365(c). FHA may also require reimbursements "because of *failure to provide* correct information." 24 C.F.R. § 203.365(c) (emphasis added). The information *must be supplied* if Chase is to receive and keep its insurance benefits. Chase did not supply this information; otherwise, it would not have been able to keep the FHA mortgage insurance benefits.

329.    Both the act of making false statements concerning fiscal data and withholding requested fiscal data are material false statements or fraudulent conduct under the FHA's mortgage insurance program.

330.    Chase supplied material false data or made a material omission constituting false statements on its claims forms for FHA insurance benefits.

331.    Chase presented claims for payment to the Government falsely implying that (a) the foreclosed homes were in default, and (b) Chase had properly engaged in loss mitigation prior to foreclosing on the homeowners. The False Claims Act, as amended by the Fraud Enforcement and Recovery Act, only requires materiality as a basis for liability. 31 U.S. C. § 3729(3)(b)(B) (*amended by* Fraud Enforcement and Recovery Act [hereinafter "FERA"], 111 Pub. L. 21 § 4(a), 123 Stat. 1617 (May 20, 2009)). Materiality is statutorily defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b); FERA, 111 P.L. 21 § 4(a).

332.    FHA regulations explicitly require—and often assume—that a mortgage servicer will not foreclose upon a homeowner unless the homeowner is in actual default. *Cf., e.g.,* 24 C.F.R. § 203.355(a) (listing actions allowed after default, including foreclosure), 203.355(c) (prohibiting foreclosures when State law does not permit foreclosure), 203.357 (noting that mortgagor must be in default before mortgagee may acquire property by voluntary conveyance),

203.370 (account must be in default before pre-foreclosure sale may commence). This requirement is part of loss mitigation, a vital component of the FHA insurance program. The requirement is so fundamental that applications for insurance benefits simply assume that the default date will be filled out. "Single-Family Application for Insurance Benefits," form HUD-27011 (07/2009), *available at* http://www.hud.gov/offices/adm/hudclips/_forms/hud2.cfm. Simply leaving that space blank will likely bring up an error message on FHA's electronic claims form. In this way, default is not just implied, but it is an actual precondition to payment in filling out an electronic form, as much as it is a precondition in a legal sense.

333. Defendants, in turn, filled out claim forms falsely indicating that mortgagors were three payments past due on their mortgages prior to foreclosure. Chase's false statements actively conceal the fact that mortgagors weren't three payments past due, and were not supposed to be foreclosed upon.

334. Additionally, loss mitigation is a precondition to *keeping* payment and loss mitigation is an explicit precondition to avoid civil monetary penalties and staying in the FHA-insurance program. *See, e.g.,* 24 C.F.R. § 203.500.

335. Thus, the FHA-insurance program's express post-conditions of loss mitigation for keeping payment is also a pre-condition for obtaining payment.

336. Loss mitigation is a central and necessary function of a mortgage servicer, mandated by the underlying statute, regulations, handbooks, and HUD letters. Beginning with the rules governing the FHA insurance program, the statute mandates that mortgagees engage in loss mitigation by stating:

> Upon default of any mortgage insured under this subchapter, mortgagees shall engage in loss mitigation actions for the purpose of providing an alternative to foreclosure (including but not limited to actions such as special forbearance, loss modification, and deeds in

> lieu of foreclosure, but not including assignment of mortgages to the
> Secretary under section 1710(a)(1)(A) of this title) as provided in
> regulations by the Secretary.

12 U.S.C. § 1715u.

337.   The regulations of FHA insured mortgages make the requirement for loss mitigation painfully clear. They state, for example, that "It is the intent of the Department that no mortgagee shall commence foreclosure or acquire title to a property until the requirements of this subpart have been followed." 24 C.F.R. § 203.500. "Mortgagees . . . must take those appropriate actions, which can reasonably be expected to generate the smallest financial loss to the Department." 24 C.F.R. § 203.501 (emphasis added). "Documentation must be maintained for the initial and all subsequent [loss mitigation] evaluations and resulting loss mitigation actions." 24 C.F.R. § 203.605 (emphasis added); *see also* 24 C.F.R. § 203.365 (requiring claim files be kept for three years after submission for benefits).

338.   The handbook for administration of insured home mortgages states that a central servicing objective is:

> protecting HUD's interest in the insured mortgage (i.e.,
> minimizing the probability of an insured mortgage terminating in
> default and foreclosure, and by minimizing HUD's loss where
> claims cannot be avoided);

"Administration of Insured Home Mortgages (4330.1)," § 1-3(B), HUD directive number 4330.1, *available at* http://www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4330.1/.

339.   HUD also made clear that foreclosure should be considered a last resort through its letters and FAQs. *See, e.g.*, "FHA NSC Loan Servicing and Loss Mitigation FAQ," *available at* http://www.hud.gov/offices/hsg/sfh/nsc/faqnsctc.cfm ("Foreclosure should only be considered as a last resort and should not be initiated until all relief options have been exhausted."). HUD's letter to mortgage servicers shouted this requirement, stating that "**PARTICIPATION IN THE**

**LOSS MITIGATION PROGRAM IS NOT OPTIONAL.**" HUD Letter, "Loss Mitigation Program – Comprehensive Clarification of Policy and Notice of Procedural Changes," *available at* http://www.hud.gov/offices/hsg/sfh/nsc/ lmmltrs.cfm (click on link next to document "00-05") (bold and capitalization in original).

340.    Failure to engage in loss mitigation carries severe penalties, as the regulations state:

> [F]ailure to comply [with loss mitigation] will be cause for
> imposition of a civil money penalty, including a penalty under
> §30.35(c)(2), or withdrawal of HUD's approval of a mortgagee.

24 C.F.R. § 203.500 (introducing the subpart describing servicing and loss mitigation requirements).

341.    Chase is "knowingly and materially failing" to engage in loss mitigation, and HUD may "initiate a civil money penalty action" for failure "to engage in loss mitigation as provided in § 203.605." *See, e.g.*, 24 C.F.R. §§ 30.35(a)(14). Such money penalties may be "three times the amount of the total mortgage insurance benefits claimed by the mortgagee with respect to any mortgage for which the mortgagee failed to engage in such loss mitigation actions." *See* 24 C.F.R. §§ 30.35(c)(2). Such money penalties are obligations under the False Claims Act that Defendants have knowingly attempted to avoid or decrease through fraudulent means.

342.    One of the purposes the FHA insurance program was created to increase home ownership. Loss mitigation is central to keeping people in their homes, and like any insurance program, FHA mortgage insurance would not work if servicers did not have the duty to minimize losses to the FHA.

343.    Defendants had agreed to engage in loss mitigation as a condition of being part of

61

the program. *See, e.g.*, 24 C.F.R. § 203.500. As a participant, Defendants also have the duty to inform FHA or HUD of any major failings in its loss mitigation program. "Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices." "Mortgagee Approval Handbook," HUD Handbook 4060.1, § 2-23, *available at* http.//www.hud.gov/offices/adm/hudclips/handbooks/hsgh/4060.1/index.cfm. The mortgagees have an active duty to inform HUD, and by failing to do so, they have concealed the breakdowns in their internal controls. Not only did Chase not inform HUD, Chase hid its failures from initial independent and FHA audits.

344.   Chase executives purposefully chose to engage in this fraudulent activity in the hopes of bypassing FHA regulatory requirements.

345.   The FHA audits Chase—and Chase hires an independent auditor to audit Chase— every year for compliance with loss mitigation regulations. Chase has an entire Loss Mitigation *Department*, staffed by professionals such as Relator Robert Harris, dedicated to loss mitigation. More than 700 people work in this capacity for Chase alone, while more than 2,000 people do this for J.P. Morgan-Chase & Co. as a whole. Chase had and has standardized methods to mitigate losses outlined by the regulations and pursued by Chase *prior* to the events discussed in the Complaint.

346.   Plaintiff-Relator was aware that every executive associated with the mortgage servicing units knew that Chase had to engage in loss mitigation, and most of the staff knew as well. In fact, Plaintiff-Relator notified Chase management officials about the Defendants' failure to comply with regulations and loss mitigation requirements and that Chase was foreclosing on loans without proper loss mitigation.

347.   Beyond the regulatory structure, Chase executives knew that their actions would

62

result in false claims being submitted to HUD and FHA and other Government agencies for insurance benefits. These facts amply demonstrate that Chase had notice of the requirement for loss mitigation, and thus Chase knew that any claim for payment implied that this requirement was met, even though Chase knew they had failed to engage in loss mitigation. In sum, Chase knew that they had a duty to engage in loss mitigation, failed to do so, hid its failure from the FHA and other Government agencies, and then created false records and falsely claimed Government insurance benefits which are fundamentally based on the assumption that Chase properly engaged in loss mitigation.

348. Defendants continued to knowingly submit or cause to be submitted false claims for payment to the Government regarding foreclosed mortgages despite Defendants knowing that they violated FHA and HUD regulations regarding the conditions for receiving and keeping said Government payments.

349. Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States in violation of 31 U.S.C. § 3729(a)(1)(G) (2010). Alternatively, Defendants knowingly made, used, or caused to be made or used, a false record or statement that is material to an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G) (2010).

350. Defendants knowingly presented or caused to be presented to the Government false claims for mortgage insurance benefits knowing that the claims were based on wrongfully foreclosed mortgages.

351. Plaintiff-Relator is aware that Chase's internal computer systems have records of Chase agents noting that the foreclosure proceedings were wrongful. ]Chase's internal records also reveal that many mortgagors had signed up for and made modified mortgage payments, and

Chase then foreclosed on those mortgagors. Defendants submitted claims for FHA benefits, but based on these internally acknowledged wrongful foreclosures, those claims by Defendants were knowingly false.

352.    Defendants also demonstrated awareness of the wrongful foreclosure problems during software development meetings attended by Defendants' executives and Plaintiff-Relator and conducted with a third party software developer, PegasusSystems, Inc. The development of this software was eventually scrapped. Chase was well aware that their systems resulted in wrongful foreclosures.    Defendants submitted or caused to be submitted claims to the Government for foreclosure insurance despite knowing about these problems and these claims for federal insurance benefits based on such wrongful foreclosures was knowingly false when made

353.    The amount of time since the beginning of the foreclosure problems and the number of foreclosures also provide additional evidence that Defendants' executives were aware they were wrongfully foreclosing on loans, either by failing to engage in loss mitigation or rejecting loss mitigation out right. The wrongful foreclosures first became a problem in 2007, became an epidemic in 2008, and are continuing and ongoing.

354.    Defendants concealed and improperly avoided or decreased its obligation to reimburse the Government for overpayment of FHA insurance benefits. Chase had agreed to engage in loss mitigation as a condition of being part of the FHA mortgage insurance program. *See, e.g.*, 24 C.F.R. § 203.500. As a participant, Chase also has the duty to inform FHA or HUD of any major failings in its loss mitigation program. "Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices." "Mortgagee Approval Handbook," HUD Handbook 4060.1, § 2-23. The mortgagees have an active duty to inform HUD, and by

failing to do so, they have concealed the breakdowns in their internal controls.

355.   In knowingly submitting or causing to be submitted false claims to the FHA for insurance benefits based on wrongful foreclosures, Defendants concealed material facts, including but not limited to, the fact that Defendants did not engage in loss mitigation, and that Defendants engaged in wrongful foreclosures. These actions served to conceal, avoid, or improperly decrease its obligation to reimburse the Government.

356.   Not only did Defendants fail to inform HUD, and other Government agencies, about these material facts, Defendants hid these failures from initial independent and FHA audits. The independent audit reports were conducted and created based on false information using Chase's false records. They were created and used *after* Chase submitted its insurance claims, concurrent with Defendants' obligation to pay the Government. Because the Government relies on the independent auditors to act as another check on fraudulent conduct, Defendants' actions further concealed its obligations to repay Government.

357.   FHA auditors review a sampling of mortgage insurance benefit claims Chase submitted on a yearly basis. This review looks only at the claims for insurance benefits without examining whether the information reported by Chase is in fact false or whether Chase is in compliance with regulations and loss mitigation requirements.

358.   The FHA disburses payment for FHA insurance benefits automatically upon reception of claims that pass "system edits and control checks." "FHA Single Family Insurance Claims," HUD Handbook 4330.4 REV-1, § 1-3(B) (discussing FHA's claim processing system), *available at* http://nhl.gov/offices/adm/hudclips/handbooks/hsgh/4330.4/index.cfm. The edits and control checks are not substantive, and automatically accept claims that look routine. *Id.*

359.   All of these actions involved Defendants knowingly concealing their obligation to

reimburse the Government, or served to improperly decrease the reimbursement demanded by the Government. 31 U.S.C. § 3729(a)(1)(G). Defendants concealed or avoided their obligation to return funds improperly obtained or avoid fines resulting from their misconduct as part of their established duty, whether or not fixed, arising from Defendants' express or implied contractual relationships, and arising from statute or regulation, or from the retention of any overpayment, in violation of 31 U.S.C. § 3729(b)(3).

360.    As a servicer, Chase has the responsibility to "fully discharge the servicing responsibilities of the mortgagee as outlined in this part." 24 C.F.R. § 203.502(a) (referring to Subsection C of 24 C.F.R. § 203). Chase "must reimburse the Secretary for any claim and interest overpaid because of incorrect, unsupported, or inappropriate information provided by the mortgagee, or because of failure to provide correct information." 24 C.F.R. § 203.365(c). The obligation to reimburse the Government comes into existence the moment Chase receives any overpayment from the Government, and exists independently of any potential audit by HUD. *Id.*

361.    Each time that Defendants knowingly violated regulations, knowingly failed to engage in loss mitigation, or wrongfully foreclosed on homeowners and Defendants still submitted or caused to be submitted false claims for FHA insurance benefits, the *entire payment* is an overpayment by the Government to Chase, and Chase has an obligation to reimburse the Government for the entire insurance benefit paid. Any such claim is a fixed amount and an obligation under the False Claims Act.

## G.    Fannie Mae and Freddie Mac

362.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

363.    Fannie Mae and Freddie Mac are both Government sponsored enterprises. Fannie

Mae and Freddie Mac are both currently in conservatorship under the Federal Housing Finance Agency, with the support and backing of the U.S. Treasury.

364.    The Federal Housing Finance Agency regulates both Fannie Mae and Freddie Mac under the same or extremely similar terms.

365.    The U.S. Treasury has already invested over $100 billion into Fannie Mae and Freddie Mac.

366.    Fannie Mae and Freddie Mac invest in and buy mortgages and Fannie Mae and Freddie Mac issue pass-through securities backed by the mortgages they own.  The securities represent property interests in a pool of mortgages.

367.    The securities pass the cash flow from individual borrowers paying off their mortgage loans to the holder (or investor) of the security.

368.    Generally speaking, the holder of a mortgage-backed security takes on the risk of a borrower being delinquent or defaulting on their loan.  While a loan is delinquent, the holder of the related mortgage-backed security does not receive any payment from that particular borrower.

369.    On the other hand, Fannie Mae and Freddie Mac issue securities that guarantee the full payment of interest and principle, regardless of whether the underlying mortgages pay out.

370.    Chase buys and owns Fannie Mae and Freddie Mac securities.   Chase also services many of the mortgages that back Fannie Mae's and Freddie Mac's mortgage-backed securities.

371.    Chase knowingly failed in its servicing duties, despite certifying every year its compliance with "all applicable Federal laws, regulations, regulatory guidance, and statutes"

67

governing its servicing duties.

372.     Chase knew that its wrongful actions would devalue the mortgages, resulting in direct losses to Fannie Mae's and Freddie Mac's mortgages.

373.     Losses to Fannie Mae's and Freddie Mac's mortgages resulted in losses on the securities backed by those mortgages.

374.     Chase's actions thus knowingly caused losses to Fannie Mae and Freddie Mac through the securities they sell, and resulted in the submission of false claims to the United States.

375.     In the meantime, Chase profited from the guaranteed securities they bought from Fannie Mae and Freddie Mac, and resulted in the submission of false claims to the United States.

376.     Even though Chase devalued the mortgages backing the guaranteed securities, Chase still made claims for payments under the Fannie Mae and Freddie Mac guaranteed securities, which is a false claim submitted to the United States.

377.     Any investor losses to Fannie Mae or Freddie Mac due to Chase's knowing failure to properly service its mortgages constitute a decrease in Chase's obligations to pay Fannie Mae and Freddie Mac. This results in reverse false claims against the United States.

**H.     Government Mortgage Insurers**

378.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

379.     For a large portion of the mortgages it services, Chase purchases servicing insurance from Government Mortgage Insurers.

380.     These mortgages do not need to have Fannie Mae or Freddie Mac or any Government sponsored entity as an investor. Government insurers will still insure a mortgage as

long as the mortgage originator meets certain minimum requirements, including Fannie Mae or Freddie Mac approval and FHA approval. The mortgage must also meet certain minimum standards, as prescribed by the insuring agency.

381.    These Government entities insure Chase's servicing costs in case of foreclosures.

382.    As a condition of insurance, Chase must engage in loss mitigation on the mortgages.

383.    Loss mitigation requires that homeowners in default be given a chance to correct their defaults. This includes the chance at a loan modification. Once a mortgagor accepts a modification, the mortgagor receives a three-installment grace period to become current on the modified loan.

384.    Knowing it had wrongfully foreclosed on homeowners, Chase made false claims for payment to Government Mortgage Insurers.

385.    The now ex-homeowners, already in financial distress, were left to bear the cost of suing Chase individually.

386.    No claims for Government mortgage insurance benefits should have been made on wrongful foreclosures.

387.    No claim for mortgage insurance should have been made on any loan in which the servicer failed to properly engage in its loss mitigation duties.

388.    Any such claims must contain false information on a mortgagor's most recent full payment, as well as other financial information, given the wrongful nature of the foreclosures.

389.    Chase wrongfully obtained payments through its submission of false claims or caused false claims to be submitted to Government Mortgage Insurers.

**I.   Government Mortgage Insurers as Investors**

390.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

391.   Government Mortgage Insurers also purchase mortgages from servicers, putting the insurer in the position of an investor.

392.   For example, Veterans Affairs refuses a lot of modifications.

393.   Instead of allowing a mortgage modification, Veterans Affairs will simply purchase the mortgage being serviced.

394.   Veterans Affairs will then contract with another entity to service the loan.

395.   The purchase price includes foreclosure fees and all charges accrued to the account.  The insurer essentially pays the full price of the mortgage, plus any extra costs associated with the defaulting loan.

396.   The purchase of the defaulted or foreclosed mortgage represents a direct loss to Veterans Affairs.

397.   Defendants failed to properly service or modify VA-backed mortgages, and wrongfully foreclosed on VA mortgages, resulting in Defendants created false records and knowingly submitting, or causing to submit, false claims to the VA for Government foreclosure insurance benefits and related fees and for causing financial losses to the VA.

398.   This type of loss to the Government applies to all Government Mortgage Insurers that purchase mortgages from their servicers.

**J.   Ginnie Mae and Mortgage-Backed Security Guarantees**

399.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

400.    Ginnie Mae guarantees the timely payment of interest and principal on securities.

401.    Ginne Mae will only guarantee securities from mortgage issuers who meet the requirements of 24 C.F.R. 320.3(a)(2).

402.    Two of the regulatory requirements are (a) the issuer must be in good standing as a mortgagee and approved by the Federal Housing Authority, and (b) the issuer must be in good standing as a mortgage seller or servicer approved by Fannie Mae or Freddie Mac.

403.    As an investment bank, Chase purchases mortgage-backed securities with Ginnie Mae guarantees.

404.    Chase owns millions of dollars worth of securities guaranteed by Ginne Mae.

405.    As a mortgage servicer, Chase services the mortgages backing those exact same securities.

406.    Chase has knowingly failed in its servicing duties, or acted in reckless disregard for its servicing duties. In doing so, it has caused Ginnie Mae to pay out benefits that it should not have.

407.    Chase, in turn, directly benefits from Ginnie Mae's guarantees, even as Chase itself knowingly caused Ginnie Mae to pay out those benefits.

408.    Chase knows that other owners of the securities made claims to Ginnie Mae because of Chase's knowing failures or reckless disregard for its servicing duties.

409.    Chase has made or caused to be made false claims for Ginnie Mae guarantees, based on false and wrongful defaults and foreclosures.

## K.    Specific Examples of Wrongfully Foreclosed Mortgages

410.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

71

411.    On each occasion that Defendants requested or demanded payment from the Government or Government investor, the total number of which during the false claims period is not currently known to Plaintiff-Relator, Defendants committed a separate violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

412.    In paragraphs 206-271, above, Plaintiff-Relator alleges specific examples of mortgage loans that became the subject of false claims submitted, or caused to be submitted, to the Government by Defendants.

413.    These types of wrongful foreclosures and resulting knowing false claims submitted, or caused to be submitted, to the Government by Defendants became an epidemic as early as December of 2008, when the company had fallen behind in mortgage servicing. At the time, Plaintiff-Relator was aware that approximately 10,000 loans were in closing status in Chase's Loss Mitigation Department, and another 16,000 such loans were "out for negotiation." Out for negotiation is the time period occurring after Chase had spoken to the mortgagor and was supposed to be negotiating with the investor (usually Freddie Mac or Fannie Mae) to come up with new terms to modify that loan. Any foreclosure during this time period constitutes a wrongful foreclosure, and any claim for FHA or other Government Mortgage Insurer benefits based on such a foreclosure constitutes a false claim.

414.    Defendants knowingly continued to wrongfully foreclose on homeowners throughout 2009 and 2010, and this practice is continuing and ongoing. As a direct result of Defendants' knowing and continuous practice of wrongfully foreclosing on homeowners, Defendants have knowingly submitted false claims for payment to the Government and concealed from the Government material information about the falsity of claims for payment of federally backed mortgage insurance, fees and expenses and other payments related to

72

foreclosure of federally insured loans and federally invested loans.

415.    In addition to the specific examples of false claims identified above, the following mortgage loans, that Plaintiff-Relator is aware were supposed to be offered loss mitigation and were eligible for loan modifications, were also wrongfully foreclosed by Defendants and subsequently resulted in false claims being submitted, or caused to be submitted, by Defendants.

416.    Prior to March 1, 2010, Defendants wrongfully foreclosed on the property located at 29250 Harding, Roseville, Michigan 48066, after Defendants failed to comply with regulations and/or loss mitigation procedures.    On or about March 1, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government in the amount of $107,650, plus fees and expenses, when said property was transferred to HUD.

417.    On or about March 31, 2010, Defendants wrongfully foreclosed on the property located at 13963 Rutherford S, Detroit Michigan 48227, after Defendants failed to comply with regulations and/or loss mitigation procedures.    On or about June 1, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government in the amount of $114,298, plus fees and expenses, when said property was transferred to HUD.

418.    On or about May 1, 2010, Defendants wrongfully foreclosed on the property located at 3220 Glenbar, Fairview Park, Ohio, after Defendants failed to comply with regulations and/or loss mitigation procedures.    On or about May 1, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim in the amount of $50,000, plus fees and expenses, to the Government when said property was transferred to Freddie Mac.

419.    On May 5, 2010, Defendants wrongfully foreclosed on the property located at 1456 N. 10th Street, Reading, Pennsylvania 19604, after Defendants failed to comply with regulations and/or loss mitigation procedures.    On or about September 15, 2010, Defendants

knowingly submitted, or caused to be submitted, a false claim to the Government in the amount of $1,700, plus fees and expenses, when said property was transferred to HUD.

420.    On or about May 12, 2010, Defendants wrongfully foreclosed on the property located at 3737 Polk, Dearborn, Michigan 48124, after Defendants failed to comply with regulations and/or loss mitigation procedures. On or about May 20, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government in the amount of $131,503, plus fees and expenses, when said property was transferred to HUD.

421.    Prior to May 13, 2010, Defendants wrongfully foreclosed on the property located at 1423 Brushy Moutnain Drive, Salem, Virginia 24153, after Defendants failed to comply with regulations and/or loss mitigation procedures. On or about May 13, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government in the amount of $171,854, plus fees and expenses, when said property was transferred to the Secretary of Veterans' Affairs.

422.    Prior to May 19, 2010, Defendants wrongfully foreclosed on the property located at 547 Hidden Trl, DeSoto, Missouri 63020, after Defendants failed to comply with regulations and/or loss mitigation procedures. On or about May 19, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government in the amount of $128,884, plus fees and expenses, when said property was transferred to HUD.

423.    Prior to July 2, 2010, Defendants wrongfully foreclosed on the property located at 11363 Steiner Drive, Jamestown, California 95327, after Defendants failed to comply with regulations and/or loss mitigation procedures. On or about July 2, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government in the amount of $267,007, plus fees and expenses, when said property was transferred to HUD.

424.     Prior to July 12, 2010, Defendants wrongfully foreclosed on the property located at 584 ½ Clifton Way, Grand Junction, CO 81504, after Defendants failed to comply with regulations and/or loss mitigation procedures. On or about July 12, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government when said property was transferred to HUD.

425.     Prior to July 21, 2010, Defendants wrongfully foreclosed on the property located at 208 Deerwood Drive, Hinesville, Georgia 31313, after Defendants failed to comply with regulations and/or loss mitigation procedures. On or about July 21, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government when said property was transferred to HUD.

426.     Prior to July 21, 2010, Defendants wrongfully foreclosed on the property located at 1892 Alsace Road, Columbus, Ohio 43227, after Defendants failed to comply with regulations and/or loss mitigation procedures. On or about July 21, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government in the amount of $62,000, plus fees and expenses, when said property was transferred to HUD.

427.     Prior to August 18, 2010, Defendants wrongfully foreclosed on the property located at 150 Woodworth, Jamestown, NY 14701, after Defendants failed to comply with regulations and/or loss mitigation procedures.  On or about August 18, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government in the amount of $178,931, plus fees and expenses, when said property was transferred to HUD.

428.     On or about August 24, 2010, Defendants wrongfully foreclosed on the property located at 370 Logan Street, Circleville, Ohio 43113, after Defendants failed to comply with regulations and/or loss mitigation procedures.  On or about October 5, 2010, Defendants

knowingly submitted, or caused to be submitted, a false claim to the Government in the amount of $97,560, plus fees and expenses, when said property was transferred to HUD.

429. On or about December 14, 2010, Defendants wrongfully foreclosed on the property located at 7326 Harold Walker Drive, Dallas, Texas 75241, after Defendants failed to comply with regulations and/or loss mitigation procedures. On or about December 23, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government when said property was transferred to HUD.

430. Prior to December 22, 2010, Defendants wrongfully foreclosed on the property located at 5165 Oaktree Trl, Lithonia, Georgia 30038, after Defendants failed to comply with regulations and/or loss mitigation procedures. On or about December 22, 2010, Defendants knowingly submitted, or caused to be submitted, a false claim to the Government in the amount of $64,000, plus fees and expenses, when said property was transferred to HUD.

431. The following properties were also known by Plaintiff-Relator to be included in Chase's loss mitigation program and were eligible for loan modifications. These loans were also wrongfully foreclosed by Defendants and subsequently resulted in false claims being submitted, or caused to be submitted, by Defendants: (a) the property at P.O. Box 108, Sallisaw, Oklahoma 74955; and (b) the property located at 19660 Kingsville Street, Detroit, Michigan 48225. Each of these properties were transferred to HUD and are currently for sale by HUD after wrongful foreclosures by Defendants and after Defendants submitted claims to HUD for payment for mortgage foreclosure insurance, fees and expenses.

432. In addition, the property located at 6025 Bear Creek Court, Columbus, Georgia 31909 was transferred to the VA and is currently for sale by the VA after wrongful foreclosures

76

by Defendants and after Defendants submitted claims to the VA for payment for mortgage insurance and expenses.

433.    On each occasion that Defendants made a certification of the type described herein, the total number of which during the false claims period is not currently known to Plaintiffs-Relators, and on each occasion that Defendants otherwise requested or demanded payment from the federal government based on having supposedly complied with requirements for obtaining payment from Government Mortgage Insurers and Government-backed investors, and with their certification-based obligations, Defendants committed a separate violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*  Also each occasion involved Defendants creating a false record to obtain payment and to conceal or decrease their obligations to the Government.

## VIII.   VIOLATIONS OF THE FALSE CLAIMS ACT

### COUNT I

434.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

435.    Under the facts presented above, Chase violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

436.    By knowingly submitting false claims to the Government for mortgage servicing fees, Chase has violated the False Claims Act.

437.    By knowingly submitting false claims for Government mortgage insurance benefits, Chase has made false claims for payment in violation of the False Claims Act.

438.    By knowingly submitting express and implied false certifications for Government benefits, Chase has made false claims for payment in violation of the False Claims Act.

439.    By submitting claims for Government mortgage-backed security guarantees

77

caused by Chase's own wrongful activity, Chase has made false claims for payment in violation of the False Claims Act.

440.   By causing others to submit claims for insurance benefits based on Chase's wrongful activity, Chase has caused false claims for payment in violation of the False Claims Act.

441.   By causing others to submit claims for mortgage-backed security guarantees based on Chase's false or wrongful activity, Chase has caused false claims for payment in violation of the False Claims Act.

442.   The United States Government has paid and continues to pay false claims as a result of Chase's conduct.

443.   Government agencies making these payments include but are not limited to Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Authority, the Department of Veterans Affairs, the Farmer's Home Administration, and the Department of Housing and Urban Development's Office of Public and Indian Housing.

444.   Damages to the Government are ongoing and continuous and include, but are not limited to, the full value of all false bills submitted by Chase, or bills that Chase caused to be submitted, in an amount to be determined at trial.

445.   Each instance of a false charge to the Government or false record for payment created under these facts is also subject to a fine of up to $10,000 under the False Claims Act, plus an adjustment for inflation under the Federal Civil Penalty Inflation Adjustment Act of 1990.

446.   All Defendants are jointly and severally liable for all damages under this count.

## COUNT II

447.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

448.   Under the facts presented above, Chase violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

449.   By knowingly using false statements or records material to claiming and receiving mortgage servicing fees from Government agencies or sources, Chase has violated the False Claims Act.

450.   By making knowingly false express and implied certifications material to claiming and receiving Government benefits, Chase has violated the False Claims Act.

451.   By knowingly using false statements or records material to claiming and receiving Government mortgage insurance benefits, Chase has violated the False Claims Act.

452.   Chase has knowingly used false statements or records material to claiming and receiving Government mortgage-backed security guarantees.  This is a violation of the False Claims Act.

453.   By knowingly causing others to submit claims for insurance benefits based on Chase's false statements or records, Chase has caused false claims for payment in violation of the False Claims Act.

454.   By knowingly causing others to submit claims for mortgage-backed security guarantees based on Chase's false records or statements, Chase has caused false claims for payment in violation of the False Claims Act.

455.   The United States Government has paid and continues to pay false claims as a result of Chase's conduct.

79

456.   Government agencies making these payments include but are not limited to Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Authority, the Department of Veterans Affairs, the Farmer's Home Administration, and the Department of Housing and Urban Development's Office of Public and Indian Housing.

457.   Damages to the Government are ongoing and continuous and include, but are not limited to, the full value of all false claims submitted by Chase, or claims that Chase knowingly caused to be submitted, in an amount to be determined at trial.

458.   Each instance of a false claim to the Government or false record for payment created under these facts is also subject to a fine of up to $10,000 under the False Claims Act, plus an adjustment for inflation under the Federal Civil Penalty Inflation Adjustment Act of 1990.

459.   All Defendants are jointly and severally liable for all damages under this count.

## COUNT III

460.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

461.   Under the facts presented above, Chase violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(D)

462.   Chase had possession, custody or control of money, property, securities, and other financial instruments in the mortgage foreclosure process.  By knowingly delivering or causing to be delivered less than all of the money or property owed the Government, Chase has violated the False Claims Act.

463.   The United States Government has not received and Chase continues to withhold money, property, and financial instruments as a result of Chase's conduct.

464.     Government agencies missing payments, property, and financial instruments include but are not limited to Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Authority, the Department of Veterans Affairs, the Farmer's Home Administration, and the Department of Housing and Urban Development's Office of Public and Indian Housing.

465.     Damages to the Government are ongoing and continuous and include, but are not limited to, the full value of all monies, property, and the value of all financial instruments withheld by Chase.

466.     Each instance of a knowingly false withholding from the Government created under these facts is also subject to a fine of up to $10,000 under the False Claims Act, plus an adjustment for inflation under the Federal Civil Penalty Inflation Adjustment Act of 1990.

467.     All Defendants are jointly and severally liable for all damages under this count.

### COUNT IV

468.     The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

469.     Under the facts presented above, Chase violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(G).

470.     By knowingly making, using, and causing to be made or used a false record or statement material to its obligation to pay Fannie Mae and Freddie Mac the full value of their mortgage investments, Chase has violated the False Claims Act.

471.     By knowingly concealing and improperly avoiding or decreasing its obligation to pay Fannie Mae and Freddie Mac the full value of their mortgage investments, Chase has violated the False Claims Act.

472.     By knowingly making, using, and causing to be made or used a false record or

81

statement material to its obligation to refund the Government for any overpayment of insurance benefits, Chase has violated the False Claims Act.

473.    By knowingly submitting express and implied false certifications for Government benefits material to an obligation to refund the Government for any overpayment of benefits, Chase has violated the False Claims Act.

474.    By knowingly concealing and improperly avoiding or decreasing its obligation to repay the Government for overpayment of mortgage insurance benefits, Chase has violated the False Claims Act.

475.    By knowingly making, using, and causing to be made or used a false record or statement material to its obligation to refund the Government for any overpayment of mortgage security guarantees obtained from Ginnie Mae, Chase has violated the False Claims Act.

476.    By knowingly concealing and improperly avoiding or decreasing its obligation to repay the Government for overpayment of mortgage security guarantees from Ginnie Mae, Chase has violated the False Claims Act.

477.    The United States Government has paid and continues to pay false claims as a result of Chase's false records and statements.

478.    Government agencies making these payments include but are not limited to Fannie Mae, Freddie Mac, Ginnie Mae, the Federal Housing Authority, the Department of Veterans Affairs, the Farmer's Home Administration, and the Department of Housing and Urban Development's Office of Public and Indian Housing.

479.    Damages to the Government are ongoing and continuous and include, but are not limited to, the full value of all knowingly false bills submitted by Chase, or bills that Chase caused to be submitted.

82

480.     Each instance of a knowingly false charge to the Government or false record for payment created under these facts is also subject to a fine of up to $10,000 under the False Claims Act, plus an adjustment for inflation under the Federal Civil Penalty Inflation Adjustment Act of 1990.

481.     All Defendants are jointly and severally liable for all damages under this count.

## COUNT V

482.     The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

483.     Defendants conspired with one another to commit the violations of the False Claims Act, 31 U.S.C. § 3729(a), described above.

484.     In performing all of the acts described herein, Defendants have defrauded the United States of America by conspiring to violate 31 U.S.C. §§ 3729(a)(1)(A), (B), (D) and (G), in contravention of the False Claims Act, U.S.C. §3729(a)(1)(C), to the damage of the treasury of the United States of America, by causing the United States to pay out money it was not obligated to pay. In carrying out these wrongful acts, Defendants have engaged in a protracted course and pattern of fraudulent conduct that was material to false claims for payment that Defendants presented/caused to be presented to the United States.

485.     As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly thousands of false claims and spent millions of dollars.

486.     Damages to the United States include, but are not limited to, the full amount it has paid on any such fraudulent claims. Defendants are liable to the United States for three times the full amount of these damages, plus interest.

487.    Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five to ten thousand dollars ($5,000 – $10,000), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990.

488.    All Defendants are jointly and severally liable for all damages under this count.

## COUNT VI

489.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

490.    Defendants violated the False Claims Act by retaliating against Plaintiff-Relator Robert Harris for his raising objections to the Defendants' practices detailed above and for engaging in other activity protected by 31 U.S.C. § 3730(h).

491.    Plaintiff-Relator complained to his superiors that the Loss Mitigation Department simply did not have enough staff to handle the backglog of its own loans to be modified. He also pointed out that the bank could not handle the loans to be modified under the MHA and FHA-HAMP programs and other Government programs.

492.    Plaintiff-Relator also repeatedly pointed out that Chase was wrongfully foreclosing on loans and he indicated that the foreclosures amounted to a fraud.

493.    Instead of hiring more staff and or improving bank procedures the bank reset some loans and wrongfully foreclosed on others as detailed above.

494.    Defendants failed to properly address Plaintiff-Relator's concerns about wrongful foreclosures and complying with their obligations with respect to handling of mortgages. Instead, Defendants submitted, or caused to be submitted, false claims to various agencies of the U.S. Government for payment of fees and other claims for payment related to Government-backed or financed mortgages that Defendants wrongfully foreclosed.

84

495.    As a direct and proximate result of Plaintiff-Relator engaging in activity protected by 31 U.S.C. §3730(h), Defendants took adverse action against Plaintiff-Relator and Defendants caused Plaintiff-Relator to go on Short Term Disability on September 11, 2009 and immediately upon Plaintiff-Relator's return to work Defendants fired Mr. Harris on or about January 11, 2010, one month before his eleven year anniversary with the company. Defendants fired Mr. Harris in retaliation for complaining about these issues on or about January 11, 2010.

496.    As a direct and proximate result of Defendant's retaliatory actions Plaintiff suffered adverse action and damages. The damages incurred by Mr. Harris include, but are not limited to, back pay, interest on the back pay, compensatory damages, including but limited to, damages for mental anguish and humiliation, loss of reputation, and attorneys' fees and costs. Plaintiff is also entitled to reinstatement to his former employment.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for all of the following:

a) That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' violations of the False Claims Act plus a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. section 3729 or any other applicable regulations plus any amount authorized by law including the Federal Civil Penalty Inflation Adjustment Act of 1990.

b) That Relator/Plaintiffs be awarded punitive damages in an amount to be determined by jury, which shall dissuade the defendant and others from similar action;

c) That the Plaintiff-Relator be awarded all reasonable attorneys fees and costs, pursuant to 31 U.S.C. § 3730 subsection (d) (1) (b) and subsection (d) (2) and subsection (h).

d) That in the event the United States Government continues to proceed with this action, the Plaintiff-Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of any award or the settlement of the claims;

e) That in the event that the United States Government does not proceed with this action, the Plaintiff-Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of any award or settlement;

f) That the Plaintiff be awarded the relief contemplated by 31 U.S.C. § 3730(h) which shall include reinstatement with the same seniority status Mr. Harris enjoyed plus two times the amount of back pay, interest on the back pay, and compensation for special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

g) That the Plaintiff-Relator be awarded pre-judgment and post judgment interest;

h) That a trial by jury be held on all issues;

i) That the United States Government and the Plaintiff-Relator receive all relief both at law and at equity, to which they may reasonably appear to be entitled.

**JURY TRIAL DEMANDED**

86

Respectfully submitted,

David K. Colapinto
BBO# 551835
Anthony C. Munter
BBO# 600016

KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, DC 20007-2756
Phone: (202) 342-6980
Fax:    (202) 342-6984
*Attorneys for Robert Harris*

February 22, 2011

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing First Amended Complaint (filed under seal pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(2)) was served upon counsel for the United States on this 22nd day of February, 2011:

John Warshawsky
Trial Attorney
United States Department of Justice
Civil Division, Fraud Section
600 E Street, N.W., Room 6912
Washington, D.C.  20004

Zachary Cunha
Assistant United States Attorney
John Joseph Moakley
United States Federal Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210

By:

David K. Colapinto

87